# 4-Illinois Official Reports

## Appellate Court

---

### *People v. Jordan*, 2019 IL App (4th) 190223

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. WILLIAM R. JORDAN, Defendant-Appellee. |
| District & No. | Fourth District<br>No. 4-19-0223 |
| Filed | December 12, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Macon County, No. 17-CF-1802; the Hon. Thomas E. Griffith Jr., Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Jay Scott, State's Attorney, of Decatur (Patrick Delfino, David J. Robinson, and Luke McNeill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.<br><br>James E. Chadd, John M. McCarthy, and Edward J. Wittrig, of State Appellate Defender's Office, of Springfield, for appellee. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Justices Knecht and Turner concurred in the judgment and opinion. |

**OPINION**

¶ 1     The State charged defendant, William R. Jordan, with unlawful possession of methamphetamine (720 ILCS 646/60(a), (b)(1) (West 2016)). Defendant filed a motion to suppress evidence against him, which the trial court granted. The State appeals, arguing the court erred. We reverse and remand for further proceedings.

¶ 2                                    I. BACKGROUND

¶ 3     In December 2017, the State charged defendant with unlawfully possessing less than five grams of a substance containing methamphetamine (*id.*). The charge stemmed from an incident in which two police officers responded to a report of a "suspicious vehicle" and encountered defendant, who was sitting inside a parked car that matched the description of the suspicious vehicle. After one of the officers observed a small "1 inch by 1 inch plastic bag" or "baggie" lying on the floorboard of the parked car, defendant was ordered to exit the vehicle, and a K-9 officer was called to the scene for a dog "sniff." The dog "hit" on the vehicle, and following a search, the police found the suspected controlled substance.

¶ 4     In August 2018, defendant filed a motion to suppress evidence, arguing he was illegally seized and detained in violation of his fourth amendment rights. He maintained that the police officers "conducting the stop" lacked any reasonable, articulable suspicion to believe that he committed or was about to commit a crime. Defendant also filed a memorandum in support of his motion to suppress, arguing he "was seized" during the encounter with the police when the officers "rejected his explanation for his presence and demanded that he answer their questions differently." He argued a reasonable person would not have felt free to leave the stop or decline to answer questions, noting that he was approached by "multiple uniformed officers" who "flanked both sides of his vehicle while shining a flashlight into the car," the officers' weapons were visible, the volume of the officers' voices increased during the stop, and the officers' requests "became more direct as the stop progressed." Defendant also argued that the presence of the small plastic bag in the car did not give rise to a reasonable suspicion of a crime because "[t]here are many lawful uses for plastic bags." Further, he asserted that the dog sniff unlawfully prolonged the stop. Defendant asked the trial court to suppress the evidence that resulted from his unlawful seizure and the search of the vehicle.

¶ 5     In February 2019, the State filed a response to defendant's motion to suppress. First, it argued that the initial encounter between defendant and the police was consensual and that defendant was not seized until the police officers ordered him to step out of the vehicle. The State also argued that the officers' observance of the small plastic bag, along with other circumstances, provided them with a reasonable, articulable suspicion of criminal activity, resulting in a lawful seizure of defendant. Alternatively, it asserted that, if defendant was seized upon the officers' approach to the vehicle, the seizure was permissible under the community caretaking doctrine. Finally, the State argued that the stop was not unduly prolonged by the decision to call and wait for a K-9 officer because "the duration of the stop was no longer than was necessary to complete the mission of the stop," *i.e.*, to investigate the suspected criminal drug activity.

¶ 6     In March 2019, the trial court conducted a hearing on defendant's motion. Defendant presented the testimony of Stephanie Vail, a police officer for the city of Decatur, Illinois. Vail testified that on the evening of October 30, 2017, the police received a call about a "suspicious

vehicle" in the 2100 block of East Lawrence Street. Specifically, a resident reported that there was a parked vehicle on that block that the resident did not recognize "and [the car's engine] was being turned on and off several times and people [were] going in and out of the vehicle." Vail testified she responded to the scene and observed a car matching the description of the suspicious vehicle. The car was parked, and its engine was turned off. Vail pulled up behind the parked vehicle in her marked patrol car, activated her in-car camera, and put a spotlight on the parked vehicle to illuminate its interior. A second police officer, Matthew Kaufman, who was also in a marked patrol vehicle, responded to the scene and parked behind Vail. Both officers were in uniform and armed.

¶ 7 Vail stated that, after arriving on scene, she conducted "an investigative stop." She walked up to the driver's side of the vehicle and made contact with the vehicle's sole occupant, who was sitting in the driver's seat. Vail stated she believed the driver's side window was up and she made contact with the vehicle's occupant by knocking on the window. The occupant, who was ultimately identified as defendant, opened the driver's side door. Vail stated she introduced herself and explained why she was there and that she had "a right" to make contact with defendant. She testified she inquired as to why defendant was there and what he was doing. Defendant responded that he was waiting on a ride. Vail asked defendant for identification and again inquired as to "why he was there." Defendant reiterated that he was "waiting on a ride." Vail then asked defendant why he was at that location specifically.

¶ 8 According to Vail, Kaufman, who had approached the parked vehicle on its passenger side, indicated that he "observed something in the vehicle, some kind of illegal packaging." Vail then asked defendant to step out of the vehicle. She described defendant as "uncooperative" and stated he responded that "he had no reason to step out of the vehicle" and that Vail "couldn't order him to step out." Vail also recalled defendant stating that he did not have shoes or a jacket on and that "it was cold out." Ultimately, defendant complied with the officers' orders to exit the vehicle; however, he refused to identify himself. Vail testified she informed defendant that he would be arrested for "obstructing identification" if he did not provide his name.

¶ 9 Approximately 10 minutes into the stop and after defendant was ordered to exit the vehicle, Vail requested that a K-9 unit respond to the scene and "conduct a sniff of the vehicle." She explained that "dispatch time" for the call was 11:23 p.m. and that she called for the K-9 at approximately 11:33 p.m. The K-9 officer arrived on the scene about four minutes later. While waiting for the K-9 to arrive, Vail continued to speak with defendant, trying to get him to identify himself. Defendant did not provide his name, but he did consent to a pat down of his person, which Kaufman performed.

¶ 10 Vail further testified that officers received information regarding calls from "dispatch" and through "dispatch notes" on their vehicle computers. Defendant submitted a printout of dispatch notes into evidence, and Vail identified them as the notes she received from the call at issue. She agreed that she received the following information: "lgt blu 4dr, unk if occupied, been sitting parked in front of the vacant lot btwn 2137-2151 *** CALLED ABOUT RESP TIME / SUBJECTS HAVE SHUT THE VEHICLE OFF / IT IS OCCUPPIED AT LEAST 2 TIMES."

¶ 11 On cross-examination, Vail testified she relied on the information she received from dispatch when approaching the parked car. Also, upon arriving at the scene, neither she nor Kaufman had the overhead emergency lights on their vehicles activated. Vail explained that

the purpose of making contact with defendant was to determine what he was doing in the area. She stated as follows:

> "It is a high drug sale use, high crime area. Therefore, we were trying to figure out when a neighbor calls in and they're concerned about a vehicle in the area, we don't know who is in that vehicle or what that vehicle is doing there. So that was basically just to inquire who is in the car, what they're doing in the car, what they're doing in the area."

Vail estimated that the police were called to the same area where the parked car was located "several times a month."

¶ 12 According to Vail, defendant reported that he was waiting in the parked car for a licensed driver to arrive. However, she continued to question him because "what he was telling [her] didn't make much sense." Specifically, Vail testified defendant had "no explanation as to why he was actually there." She stated defendant did not live in that area and had no family or friends that lived there.

¶ 13 Vail further testified that when she and Kaufman initially made contact with defendant he was free to leave. However, he was no longer free to leave at the time she "pulled him out" of the vehicle "since *** Kaufman viewed the potential drug packaging in the vehicle."

¶ 14 On redirect examination, Vail testified that, when she described the area defendant was in as a high crime area, she was referring to "that block" and "even blocks to the north and south." However, she did not have any statistics or specific details regarding that area or the circumstances of the police being dispatched there.

¶ 15 On questioning by the trial court, Vail provided more information regarding defendant and the parked car's location. She also testified that, during the encounter with defendant, he reported that he did not have a valid driver's license.

¶ 16 The State presented Kaufman's testimony. Kaufman described the location of the encounter—the 2100 block of East Lawrence Street—as "a high drug, high crime neighborhood," stating the police had received complaints of narcotics sales on the same block and that there had been shootings that occurred in the area. Kaufman testified he responded to the report of a "suspicious vehicle" and was given a description of the vehicle and its location along with information that the vehicle "was on at one point and off at one point and people had been coming and going to and from the vehicle." Kaufman stated he received information about the call through a computer terminal in his squad car.

¶ 17 Upon arriving at the scene, Kaufman observed a parked vehicle that matched the description he was given. Vail responded to the scene in a separate vehicle, and Kaufman parked his squad car behind Vail's car. While Vail approached the driver's side of the parked vehicle, Kaufman approached the passenger side. Vail spoke with the vehicle's occupant, who was later identified as defendant, and Kaufman used his flashlight to look for items in plain view inside the vehicle. He testified he "saw an approximately 1 inch by 1 inch plastic bag" that was "partially concealed under the floor mat on the front passenger's side of the vehicle." Kaufman testified the bag had a "press seal" and that it looked "like a sandwich bag" but tinier. The following colloquy then occurred between the trial court and Kaufman:

> "THE COURT: —hang on. I am confused. I've never seen a 1 inch by 1 inch sandwich bag.

- 4 -

A. That's because based on my police training and experience, it's a single use bag specifically used for street level narcotic sales. It's about this big by this wide (Indicating) and it's got—

THE COURT: —and it's got a seal on the top?

A. It does.

THE COURT: Okay. All right. Learn something new every day."

¶ 18 Kaufman further testified that he had never seen "that type of baggie" outside of drug sales; however, he agreed that he was "not saying that nobody has." He stated he suspected "that there might be illegal narcotics" in the small plastic bag he observed and testified his suspicions were based on the following circumstances:

"The history of that specific block; the complaint, it was third shift hours; the car did not check to that area, it checked to a female and there was a male driver; my observations of the baggie on the floorboard, based on my police training and experience, I know those specific bags to be only used, from my experience, for street level narcotics sales or use."

¶ 19 Kaufman testified that he and Vail had not been at the scene very long when he observed the small plastic bag on the floor of the vehicle. As soon as he saw the small plastic bag, he crossed to the driver's side of the vehicle and asked defendant to step out of the vehicle. Kaufman stated that, prior to "pulling him out of the vehicle," defendant had been free to leave. However, he was not free to leave after being pulled out. Once defendant was out of the vehicle, a pat down of his person was conducted for officer safety. A K-9 officer was also called to the scene. Kaufman estimated that it took four minutes for the K-9 officer to arrive. He testified that the K-9 "hit" on the vehicle and he conducted a probable cause search of the vehicle and defendant's person. Inside the vehicle by the driver's door, Kaufman found "a corner of a sandwich bag" with "a pink purple substance" inside of it. Based on his training and experience, Kaufman believed the substance was ecstasy. He stated that cannabis seeds were also found in a vial inside of the vehicle.

¶ 20 On cross-examination, Kaufman agreed that information he received from dispatch would have appeared on the computer in his vehicle. He believed that, prior to "meeting" defendant, the only information he had about the "call" was what was relayed through his computer. However, he testified that, to know if anything was "relayed over the radio, you would have to listen to the radio logs." Kaufman agreed that the information contained in the printout submitted into evidence by defendant was what would have been relayed to him on the computer. He agreed that the printout did not contain a report about "people coming to and from" the suspicious vehicle. After reviewing his report regarding the incident, Kaufman also acknowledged that the vehicle at issue was registered to a male named Larry Clayton and not a female as he had previously testified.

¶ 21 Kaufman further stated that nothing was found inside the "1 inch by 1 inch" bag he observed on the floor of the vehicle. Additionally, he could not recall ever purchasing clothing that came with buttons in small plastic bags. On questioning by the trial court, Kaufman testified that the small plastic bag was not collected as evidence because there was nothing inside of it.

¶ 22    At the hearing, defendant also submitted the in-car recording from Vail's squad car into evidence and a recording of the 911 call that initiated the underlying encounter. Both recordings were admitted into evidence and played for the trial court.

¶ 23    The content of the in-car recording was substantially consistent with the officers' testimony at the suppression hearing. It reflected that Vail approached the parked vehicle on the driver's side while Kaufman approached on the passenger side. Vail knocked on the driver's side window, and defendant opened the driver's side door. Vail stood between the open door and the vehicle when speaking with defendant. At times, she placed one hand on the top of the driver's side door and her other hand on the top of the vehicle.

¶ 24    The recording also reflects that, when initiating contact with defendant, Vail introduced herself and explained that the police had received a report of a suspicious vehicle. She stated to defendant that "when people call in about that stuff we have a right to come out here and make contact with you." Vail then asked defendant "what are you doing here," and defendant responded that he was "waiting on a friend to come take the car." Vail questioned whether the car was "broken," and defendant responded that it was not; he just did not have a driver's license. Vail next asked defendant if he had any identification. Defendant responded that he did not and that he did not feel like he had to present identification because he had not done anything illegal. Again, Vail asked defendant "why are you over here, do you live over here," and defendant reiterated that he was "waiting on a ride" and a "driver." Vail then asked defendant if he was "understanding [her] questioning" and asked: "What made you come over here? Do you live over here, do you know someone over here, anything like that?" Immediately thereafter, Kaufman approached from the other side of the vehicle, and defendant was ordered to step out of the car.

¶ 25    The recording further showed that defendant was ordered to exit the vehicle approximately two minutes into the stop. About three minutes later, Vail requested the assistance of a K-9 officer. The K-9 officer arrived at the scene four to five minutes after Vail's request.

¶ 26    Ultimately, the trial court granted defendant's motion and ordered "[a]ny evidence seized pursuant to the stop" suppressed. In setting forth its ruling, the court stated as follows:

> "Here, we had a report of suspicious activity from the start. I believe the police were investigating some criminal situation. Having said that, I do believe that it was clearly initially a consensual encounter. I believe the police had the right to approach the vehicle, ask the defendant his name and so on. However, from the time the defendant was ordered to exit the vehicle, he was clearly seized. The officers have admitted as much. The question therefore becomes did the officers have probable cause or a reasonable, articulable suspicion to justify the seizure, the delay. It was about a 10-minute delay. Then there was an additional 4-minute delay before the dog got there. There is an indication by the dog and then the subsequent arrest. The answer, at least in my mind, is no. Really the seizure and the order from the vehicle was all based on the officer's observations of the 1 by 1 inch baggie square. There's no indication the baggie contained drugs. In fact, the officer admitted as much. There is no indication that possessing a baggie like that is illicit at all. As [defendant's counsel] pointed out, I have seen those little baggies containing extra buttons for suits and so on. I don't believe the other facts that [*sic*] allow the police to bootstrap their argument, apparently it was dark, it is a high crime area, there were apparently a number of people in the car, the defendant was uncooperative and so on. I certainly do not find bad faith on the part

of the police officers. I just do not find that there were any facts. Their fact were [*sic*] really, other than the bootstrapping, based solely on the baggie square to justify the seizure, the detention and then the search of the defendant's vehicle."

¶ 27 Following the trial court's ruling, the State filed a certification of impairment. It asserted the court's grant of defendant's motion to suppress substantially impaired its ability to prosecute the case.

¶ 28 This appeal followed.

¶ 29                                                    II. ANALYSIS

¶ 30 On appeal, the State argues the trial court erred by granting defendant's motion to suppress. It contends that, although the court correctly determined that there was initially a "consensual encounter" between the police officers and defendant, it erred in finding the officers lacked reasonable suspicion to detain defendant after Kaufman observed the small plastic bag on the floorboard of the parked vehicle. It maintains the officers had a reasonable, articulable suspicion of criminal activity based on the totality of the circumstances, including Kaufman's observation of the small plastic bag.

¶ 31                                              A. Standard of Review

¶ 32 "A circuit court's ruling on a motion to suppress presents questions of both fact and law." *People v. Manzo*, 2018 IL 122761, ¶ 25, 129 N.E.3d 1141. The court's factual findings are given deference and will be reversed only when they are against the manifest weight of the evidence. *Id.* "A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." (Internal quotation marks omitted.) *People v. Peterson*, 2017 IL 120331, ¶ 39, 106 N.E.3d 944. "If the reviewing court accepts the trial court's factual findings, it conducts a *de novo* review of whether suppression was appropriate under those facts." *Manzo*, 2018 IL 122761, ¶ 25.

¶ 33                                        B. Timing of the Police Seizure

¶ 34 As stated, the State maintains that the police officers and defendant were initially engaged in a consensual encounter, which escalated to a seizure once defendant was ordered to exit the vehicle. It contends the trial court agreed with this portion of its argument and correctly determined the initial encounter was consensual.

¶ 35 Defendant responds, however, by arguing that Vail and Kaufman seized him prior to Kaufman's observation of the small plastic bag. He asserts that the trial court "never decided whether the *entire* stop before Kaufman's observation of the plastic bag was consensual." (Emphasis in original.) Stated another way, he argues that the court "never determined if the officers seized [defendant] sometime between initially approaching him and ordering him from the blue car." Defendant maintains that he was effectively and improperly seized "after Vail's repeated and insistent questioning" at a time when he "lack[ed] any means to terminate the encounter." He argues that the court's grant of his motion to suppress may be affirmed on this basis.

¶ 36 First, we disagree with defendant's interpretation of the trial court's findings. In setting forth its ruling on the motion to suppress, the court explicitly stated as follows:

"I believe the police were investigating some criminal situation. Having said that, I do believe that it was clearly initially a consensual encounter. I believe the police had the right to approach the vehicle, ask the defendant his name and so on. However, from the time the defendant was ordered to exit the vehicle, he was clearly seized."

The court's comments are not ambiguous or unclear. Further, they plainly show a determination by the court that the underlying encounter was consensual up and until the point when the officers ordered defendant to exit the vehicle.

¶ 37    Second, assuming defendant's assertion regarding the trial court's ruling is correct, we find his ultimate contention regarding the timing of his seizure is without merit. Instead, the evidence supports a finding that a seizure occurred only after Kaufman observed the small plastic bag and the officers ordered defendant to exit the vehicle.

¶ 38    "It is well settled that not every encounter between the police and a private citizen results in a seizure." *People v. Luedemann*, 222 Ill. 2d 530, 544, 857 N.E.2d 187, 196 (2006). Rather, police-citizen encounters may be divided into the following three tiers: "(1) arrests, which must be supported by probable cause; (2) brief investigative detentions, or '*Terry* stops[ ]' [(see *Terry v. Ohio*, 392 U.S. 1 (1968)),] which must be supported by a reasonable, articulable suspicion of criminal activity; and (3) encounters that involve no coercion or detention and thus do not implicate fourth amendment interests." *Id.* "Third-tier encounters are also known as consensual encounters." *Id.* Consistent with third tier encounters, "a police officer does not violate the fourth amendment merely by approaching a person in public to ask questions if the person is willing to listen." *Id.* at 549. Further, police officers "have the right to approach citizens and ask potentially incriminating questions." *Id.*

¶ 39    A seizure does occur for fourth amendment purposes "when an officer by means of physical force or show of authority, has in some way restrained the liberty of a citizen." (Internal quotation marks omitted.) *Id.* at 550. When the police-citizen encounter involves an individual who, for example, "is walking down a street or through an airport lobby," the test for determining whether a seizure occurred is whether a reasonable person in the individual's position would feel "free to leave" under the circumstances. *Id.* However, when the individual encountered by the police is seated in a parked vehicle, the appropriate test is whether a reasonable person in the individual's position would have believed he or she "was free to decline [the police officer's] requests or otherwise terminate the encounter." *Id.* at 550-51. These tests presuppose "a reasonable *innocent* person" and require "an objective evaluation of the police conduct in question." (Emphasis in original.) *Id.* at 551.

¶ 40    The supreme court has acknowledged "the general rule that the police may approach and question a person seated in a parked vehicle without that encounter being labeled a seizure." *Id.* at 552. Such an "encounter becomes a seizure only if the officer, through physical force or a show of authority, restrains the liberty of the vehicle's occupant." *Id.* at 552-53.

¶ 41    Courts have identified four factors—known as the *Mendenhall* factors—which may indicate the seizure of a person by the police: "(1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) some physical touching of the person of the citizen; and (4) the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* at 553 (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). "The factors illustrate what type of police conduct would give a reasonable person an objective reason to believe that he or she was not free to leave or was not free to

decline an officer's requests." *Id.* at 555. Referencing the *Mendenhall* factors, our supreme court has stated as follows:

> "From the very minute the *Mendenhall* factors were created, courts have used their absence to determine that seizures had not occurred.
>
>    \*\*\* [I]t would seem self-evident that the absence of *Mendenhall* factors, while not necessarily conclusive, is highly instructive. If those factors are absent, that means that only one or two officers approached the defendant, they displayed no weapons, they did not touch the defendant, and they did not use any language or tone of voice indicating that compliance with their requests was compelled. Obviously, a seizure is much less likely to be found when officers approach a person in such an inoffensive manner." *Id.* at 554.

¶ 42    The *Mendenhall* factors are not exhaustive. *Id.* at 557. Other factors "indicative of a seizure of a parked vehicle are 'boxing the car in, approaching it on all sides by many officers, pointing a gun at the suspect and ordering him to place his hands on the steering wheel, or use of flashing lights as a show of authority.' " *Id.* (quoting 4 Wayne R. LaFave, Search and Seizure § 9.4(a), at 434-35 (4th ed. 2004)).

¶ 43    Here, the evidence presented was not indicative of a seizure prior to the time the officers ordered defendant to exit the parked vehicle. Only two officers, rather than several, approached the parked vehicle. Although the officers were in uniform and armed, they did not display their weapons. The officers did not touch defendant. Further, Vail's tone of voice when speaking with defendant was conversational. Neither officer issued any orders or used language or a tone of voice that would indicate that defendant's compliance with the officers was compelled *until* the officers began ordering defendant to exit the vehicle. In other words, there was a complete absence of any of the *Mendenhall* factors. Other factors also weigh in favor of finding no seizure, including that the officers both parked their patrol vehicles behind the parked car without boxing it in and that they did not utilize their flashing lights when arriving on scene as a show of authority.

¶ 44    On appeal, defendant points to several facts he believes were indicative of a seizure before the officers ordered him to exit the vehicle. Initially, he argues that the first *Mendenhall* factor was, in fact, present in this case, in that he was faced with the "threatening presence of several officers." We disagree. As noted, defendant was approached by only two police officers—Vail and Kaufman. In *Luedemann*, the supreme court described circumstances in which the *Mendenhall* factors were absent as including those situations where "only one or two officers approached the defendant." *Id.* at 554. Accordingly, to have the presence of "several" officers, there necessarily must be more than two officers present.

¶ 45    Next, defendant complains that Vail directed her spotlight at the parked car and the officers used flashlights, which were shining at him. In *Luedemann*, the supreme court stated that "[i]t is well settled that the use of a flashlight to illuminate a vehicle located on a public way is not a fourth amendment search." *Id.* at 561. Further, "[w]hether the use of a flashlight constitutes a fourth amendment seizure depends on whether the officer engaged in other coercive behavior." *Id.* In this instance, the encounter at issue occurred at night and necessitated the officers' use of illumination in some form to observe the scene and the parked vehicle. As the record fails to reflect "other coercive behavior" engaged in by the officers, we decline to find that either the use of the spotlight or flashlights transformed the encounter into a seizure.

¶ 46    On appeal, defendant further argues that he was prevented from closing the car door and ending the encounter when Vail stood between the car and the open driver's door and braced her arms on both the car and the door. Again, we disagree that such behavior constituted a show of force or authority, weighing in favor of finding a seizure. The manner in which defendant engaged in the consensual encounter with Vail, *i.e.*, by opening the car door, required that Vail position herself in the opening of the door. Such positioning enabled Vail to speak with defendant. Further, it did not necessarily prevent defendant from ending the encounter or declining any of Vail's requests for information. In fact, defendant did decline a request to provide information regarding his identity.

¶ 47    Defendant also contends that Vail indicated he was not free to leave or terminate the encounter through her persistent questioning. Again, however, police officers "have the right to approach citizens and ask potentially incriminating questions." *Id.* at 549. In this instance, Vail simply posed various questions to defendant. She did not make demands or issue orders to defendant until after Kaufman observed the small plastic bag. While Vail did question defendant three times regarding why he was at his specific location, her repeated questions were due to defendant's apparent misapprehension of what she was asking and her attempt to clarify her meaning. Defendant further argues that the officers ignored his "attempts to refuse the officers' demands to produce identification." However, the record refutes this contention. Prior to being ordered from the car, Vail asked defendant on only one occasion if he had any identification. Defendant responded that he did not have identification and that he did not feel like he had to present any. No further questions were posed to defendant regarding his identity or identification until after he was ordered to exit the vehicle and clearly seized. Given the circumstances presented, we do not find the manner of Vail's questioning was indicative of a seizure.

¶ 48    Finally, defendant asserts that he was prevented from driving away or exiting the parked car during his encounter with Vail and Kaufman due to the officers' positioning on either side of the car. Again, we disagree. "[T]he fact that two officers approached [a] defendant from opposite sides of the vehicle, absent other evidence, does not transform a consensual encounter into a seizure." *People v. Lopez*, 2013 IL App (1st) 111819, ¶ 32, 996 N.E.2d 212 (citing *People v. Cosby*, 231 Ill. 2d 262, 278, 898 N.E.2d 603, 613 (2008)). Here, for the reasons already stated, we find that the totality of the circumstances in this case reflects a consensual encounter prior to the time defendant was ordered from the vehicle.

¶ 49    We note that defendant cites two Fourth District cases to support his contention of a seizure based on the officers' positioning in this case. However, we find those cases are factually distinguishable, as both involved additional facts indicative of a seizure beyond the positioning of the police officers relative to the defendant. Specifically, in *People v. Winchester*, 2016 IL App (4th) 140781, ¶ 44, 66 N.E.3d 601, we found that a seizure had occurred where the defendant's vehicle was parked between two cars, the police officer was positioned by the defendant's driver's door, and the officer requested the defendant open his car door *after* the defendant had declined the encounter by stating " 'no policia' " and extending his middle finger. We held that the officer's "request for [the] defendant to open his door after he declined the encounter demonstrate[d] [the defendant's] compliance was required." *Id.* Here, there was no similar declining of the encounter by defendant or request by the officers.

¶ 50    Additionally, in *People v. Allen*, 409 Ill. App. 3d 1058, 1069-70, 950 N.E.2d 1164, 1176-77 (2011), we held that a reasonable person in the defendant's position would not have felt free

to discontinue contact with the police under circumstances where "two squad cars blocked the vehicle in which [the] defendant sat and two officers positioned themselves on either side of the car and engaged the passengers in an investigatory conversation." Here, although Vail and Kaufman approached the parked car on either side, only Vail interacted with defendant. Most important, however, the officers did not exhibit the clear show of authority described in *Allen* by parking their squad cars in such a way that the vehicle defendant occupied was "blocked *** in."

¶ 51　　　 Ultimately, the evidence in this case demonstrates that the officers approached defendant in an inoffensive manner. A reasonable person in defendant's position would have felt free to decline the officers' requests or terminate the encounter, and the record indicates defendant did, in fact, hold that subjective belief as he declined Vail's request that he provide identification. Accordingly, based on the facts presented, we agree that the officers did not seize defendant until after Kaufman observed the small plastic bag and they began ordering him to exit the parked vehicle.

¶ 52　　　　　　　　　　　　 C. Reasonable Suspicion of Criminal Activity

¶ 53　　　 As expressed, the State agrees with the trial court's finding that defendant was seized at the time the police officers ordered him to exit the parked vehicle. However, it contends the court erred in determining that the officers had no reasonable, articulable suspicion to justify that seizure. The State maintains that the officers had a reasonable suspicion of criminal drug activity based upon the totality of the circumstances, including Kaufman's observation of the small plastic bag that was lying on the parked vehicle's passenger-side floorboard. Further, it argues that the court improperly failed to consider the totality of the circumstances known to the officers at the time of the seizure when granting defendant's motion to suppress.

¶ 54　　　 Under both the fourth amendment to the United States Constitution and article I, section 6, of the Illinois Constitution, citizens are protected against unreasonable searches and seizures. *People v. Timmsen*, 2016 IL 118181, ¶ 9, 50 N.E.3d 1092 (citing U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6). The state and federal constitutional provisions are interpreted in "limited lockstep," meaning the search-and-seizure provision of the Illinois Constitution is construed "in accordance with the United States Supreme Court's interpretation of the fourth amendment unless any of the narrow exceptions to lockstep interpretation apply." *People v. Holmes*, 2017 IL 120407, ¶ 24, 90 N.E.3d 412. Neither party argues that an exception to lockstep interpretation applies in the present case.

¶ 55　　　 "The touchstone of the fourth amendment is 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' " *Timmsen*, 2016 IL 118181, ¶ 9 (quoting *Terry*, 392 U.S. at 19). An encounter between a police officer and an individual in a parked vehicle " 'becomes a seizure if the officer orders the suspect to "freeze" or to get out of the car.' " *Luedemann*, 222 Ill. 2d at 557 (quoting 4 Wayne R. LaFave, Search and Seizure § 9.4(a), at 433-34 (4th ed. 2004)). Further, "[c]ase law recognizes two types of seizures of the person: an investigatory stop and an arrest." *People v. Leggions*, 382 Ill. App. 3d 1129, 1132, 890 N.E.2d 700, 705 (2008). "Pursuant to *Terry*, a police officer may conduct a brief, investigatory stop of a person where the officer reasonably believes that the person has committed, or is about to commit, a crime." *Timmsen*, 2016 IL 118181, ¶ 9 (citing *Terry*, 392 U.S. at 22). The following analysis is applicable to brief, investigatory stops, *i.e.*, *Terry* stops:

"The officer must have a reasonable, articulable suspicion that criminal activity is afoot. [Citation.] Although reasonable, articulable suspicion is a less demanding standard than probable cause, an officer's suspicion must amount to more than an inchoate and unparticularized suspicion or hunch of criminal activity. [Citation.] The investigatory stop must be justified at its inception[,] and the officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the governmental intrusion upon the constitutionally protected interests of the private citizen. [Citation.] In judging the officer's conduct, we apply an objective standard and consider, would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate? [Citation.] Further, when evaluating the validity of the stop, we consider the totality of the circumstances—the whole picture. [Citation.]" (Internal quotation marks omitted.) *Id.*

¶ 56    Here, the record clearly shows defendant was seized by the police when he was ordered out of the parked car and that the seizure occurred after Kaufman observed the small plastic bag, which had been partially obscured. Additionally, Kaufman stated he suspected "that there might be illegal narcotics" in the small plastic bag and that his suspicions were based on the following circumstances:

"The history of that specific block [(which Kaufman described as being in 'a high drug, high crime neighborhood')]; the complaint, it was third shift hours; the car did not check to that area, it checked to a female and there was a male driver; my observations of the baggie on the floorboard, based on my police training and experience, I know those specific bags to be only used, from my experience, for street level narcotics sales or use."

¶ 57    Initially, defendant responds to the State's arguments on appeal by asserting that the trial court's comments reflect that it made credibility determinations and rejected Kaufman's testimony regarding the basis of his suspicions. He contends the court made factual findings that the neighborhood where the underlying encounter occurred was not a "high drug, high crime neighborhood" and that the small plastic bag was not connected with drug activity. Defendant argues that the court ultimately made a factual determination that there were not "any other facts present, outside of Kaufman's observation of the plastic bag, that could give rise to reasonable suspicion or probable cause that [the plastic bag] contained contraband." Accordingly, he maintains that this court should give deference to the trial court's factual findings and not overturn them unless they are against the manifest weight of the evidence.

¶ 58    We disagree with defendant's assertions regarding the trial court's credibility determinations and factual findings. Notably, nothing in the record indicates that the court found the testimony of the police officers unbelievable or that either officer was not credible. As the State points out, the court explicitly found no "bad faith on the part of the police officers," indicating it did believe their testimony but simply concluded that reasonable suspicion was lacking nonetheless.

¶ 59    Additionally, the court made no explicit finding that it did not accept Vail and Kaufman's description of the stop, and we disagree with any assertion that such a finding was implicit in the court's comments. In setting forth its ruling, the court stated as follows:

"I don't believe the other facts that [*sic*] allow the police to bootstrap their argument, apparently it was dark, it is a high crime area, there were apparently a number of people

- 12 -

in the car, the defendant was uncooperative and so on. I certainly do not find bad faith on the part of the police officers. I just do not find that there were any facts. Their fact were [*sic*] really, other than the bootstrapping, based solely on the baggie square to justify the seizure, the detention and then the search of the defendant's vehicle."

Here, the court's comments do not reflect that it rejected or made factual findings that were contrary to the "other facts" it listed. We note that, had it done so, any finding that it was not dark outside at the time of the encounter or that defendant did not behave in a contrary manner with the police would have been clearly and indisputably refuted by the record. Instead, rather than disbelief or rejection of the "other facts" supporting seizure, the court was expressing its determination that the "other facts" were insufficient to justify a reasonable suspicion of criminal activity. We find that this determination raises an issue of law, not one of fact.

¶ 60    Similarly, the trial court also made no explicit or implicit finding evidencing a rejection of Kaufman's testimony that, from his experience, the small plastic bag he observed was used "for street level narcotics sales or use." Regarding the small plastic bag, the court stated as follows:

"Really the seizure and the order from the vehicle was all based on the officer's observations of the 1 by 1 inch baggie square. There's no indication the baggie contained any drugs. In fact, the officer admitted as much. There is no indication that possessing a baggie like that is illicit at all. As [defendant's counsel] pointed out, I have seen those little baggies containing extra buttons for suits and so on."

Ultimately, the court did determine that the small plastic bag was not distinctly associated with drug activity and that it could be associated with a lawful purpose. This finding was not against the manifest weight of the evidence. We note that even Kaufman agreed it was not his testimony that such an item was used exclusively for drug activity. However, we also find that a determination that the small plastic bag was not distinctly associated with drug activity is different from a complete rejection of Kaufman's testimony as to his experience with that type of item. In other words, a factual finding by the court that the small plastic bag may have an innocent explanation does not equal a finding that Kaufman was not credible when he testified that, in his experience, such an item was associated with criminal drug activity. In fact, both circumstances may be true. See *People v. Garcia*, 2012 IL App (1st) 102940, ¶ 16, 978 N.E.2d 366 (noting that "[i]nnocuous objects such as plastic baggies, spoons, mirrors, and straws are often used in the narcotics trade").

¶ 61    Here, we find the State's appeal turns not on a question of fact, but one of law, requiring a determination of whether the facts present at the time of the seizure, which were testified to by Kaufman and Vail and accepted and found by the trial court, were sufficient to justify a reasonable suspicion of criminal drug activity by defendant. We review this issue *de novo*.

¶ 62    On appeal, the State argues that a reasonable suspicion of criminal activity was justified after Kaufman observed the small plastic bag. In addressing that item, both parties cite case authority that focuses on whether an officer's observation of a suspicious package or container provides *probable cause* for a subsequent search or seizure. We note, however, that probable cause and reasonable suspicion are two different standards. "Probable cause means more than bare suspicion" and "exists where the arresting officer has knowledge of facts and circumstances that are sufficient to justify a reasonable person to believe that the defendant has committed or is committing a crime." *People v. Jones*, 215 Ill. 2d 261, 273-74, 830 N.E.2d 541, 551 (2005). Alternatively, "reasonable, articulable suspicion is a less demanding standard

than probable cause." (Internal quotation marks omitted.) *Timmsen*, 2016 IL 118181, ¶ 9. As stated above, the reasonable suspicion standard requires that an officer "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the governmental intrusion upon the constitutionally protected interests of the private citizen." *Id.* As a result, facts and circumstances giving rise to a reasonable suspicion of criminal activity will not necessarily meet the probable cause standard. See *People v. Edward*, 402 Ill. App. 3d 555, 562, 930 N.E.2d 1077, 1083 (2010) ("It is well settled that the facts underlying a claim of reasonable suspicion need not rise to the level of probable cause and do not require an officer to actually witness a violation.").

¶ 63     Although the cases cited by the parties are not directly on point, we find the case authority relied upon by the State is particularly instructive. First, in *People v. Jones*, 214 Ill. App. 3d 256, 257, 574 N.E.2d 772, 773 (1991), the dispositive issue was "whether the arresting police officer had probable cause to search a small manila envelope that fell from [the] defendant's wallet during the course of an investigatory stop." The evidence showed that the officer asked the defendant for some identification and, as the defendant opened his wallet, "a small manila envelope fell out of the wallet and dropped to the ground." *Id.* The envelope was "an inch wide and a little more than an inch long." *Id.* at 258. "[A]fter the envelope fell to the ground, [the] defendant tried to cover it with his shoe." *Id.* at 257. The police officer told the defendant to move his foot and picked up the envelope. *Id.* He asserted that he "had seen similar envelopes more than 50 times during his career as a police officer" and "[e]very time *** it had been used to carry a controlled substance." *Id.* at 257-58. The officer opened the envelope and discovered cannabis inside. *Id.* at 258.

¶ 64     On review, the Second District determined that probable cause existed for the officer to search the manila envelope. *Id.* at 260. In so holding, the court stated as follows:

> "Assuming *arguendo* that the mere viewing of such an envelope was not sufficient to create probable cause, even though [the officer] had seen similar envelopes over 50 times and they had been used to carry controlled substances every time, it *would certainly have created a strong suspicion in the mind of a reasonable individual* with [the officer's] experience and knowledge that the envelope contained a controlled substance. This suspicion combined with the suspicion arising from defendant's attempt to cover the envelope with his shoe *** was sufficient to establish probable cause in our opinion." (Emphasis added.) *Id.*

¶ 65     Second, the State also heavily relies on *People v. Hilt*, 298 Ill. App. 3d 121, 123, 698 N.E.2d 233, 234 (1998), where, after effectuating a traffic stop in an area known for drug trafficking, a police officer shined a flashlight into the car to check for weapons and contraband and "saw a knotted piece of a baggie on the car's rear floorboard." During a suppression hearing, the police officer "testified that in his experience based on having made 50 to 100 drug arrests, drug dealers often packaged cocaine by tying a knot in a corner of a plastic bag, then tearing off the rest of the bag to make a very small package." *Id.* Ultimately, the officer searched the vehicle and found a crack pipe that the defendant admitted was hers and "a small rock-like substance." *Id.* The trial court granted a motion to suppress evidence in the case. *Id.*

¶ 66     On review, the Second District reversed. *Id.* at 126. It noted that, "[w]here an item is seen in plain view, it must be immediately apparent that the object is contraband or evidence of a crime before the object's presence will establish *probable cause* for a search." (Emphasis added and internal quotation marks omitted.) *Id.* at 124. Further, it found the knotted "baggie"

- 14 -

in the case before it "was distinctive enough to announce that it formerly contained narcotics." *Id.* at 125. Further, the court stated as follows:

> "The totality of the circumstances here—the presence of the unique container, the officer's previous experience with such containers, and the fact that the stop occurred in the early morning hours in an area known for drug transactions—provided the officers with probable cause to search defendant's car. Thus, the trial court erred in suppressing the fruits of the search." *Id.* at 126.

¶ 67    We also note *Garcia*, 2012 IL App (1st) 102940, ¶ 5, where the First District was called upon to determine "[w]hether the incriminating nature of the plastic baggie protruding from [the] defendant's front pants pocket was immediately apparent" such that a police officer had probable cause to seize the "baggie." In finding such a seizure was not justified, the court concluded that, although a police officer's observation of "a clear knotted plastic baggie protruding from [the] defendant's front pants pocket *** may have created a *reasonable suspicion justifying further investigation*, *** such an observation standing alone generally does not rise to the level of probable cause." (Emphasis added.) *Id.* ¶ 13. The court reasoned that the bag's incriminating character was not immediately apparent. *Id.*

¶ 68    On appeal, defendant argues that the small plastic bag Kaufman observed on the floorboard of the parked vehicle could not have supported a reasonable suspicion of criminal activity because it was not uniquely or distinctly associated with criminal drug activity. The trial court applied the same reasoning, finding that the small plastic bag itself was not illicit and could have been put to an innocent use and not for narcotics packaging. We find, however, that such considerations, while critical to a probable cause analysis of an item observed in plain view, are not necessarily determinative of reasonable suspicion. As indicated in both *Jones* and *Garcia*, the observation of an item, which from a police officer's training and experience can be associated with narcotics activity but which is also possibly innocuous, *i.e.*, a small manila envelope or a knotted plastic bag, may be supportive of reasonable suspicion, warranting further investigation.

¶ 69    In *Timmsen*, 2016 IL 118181, ¶ 44, the supreme court held that, "[w]here possibly innocent conduct also suggests criminal activity, *** an investigative stop is justified to resolve the ambiguity." Further, police officers are "not required to rule out all possibility of innocent behavior before initiating a *Terry* stop." (Internal quotation marks omitted.) *People v. Close*, 238 Ill. 2d 497, 511, 939 N.E.2d 463, 471 (2010). "[T]he relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." (Internal quotation marks omitted.) *United States v. Sokolow*, 490 U.S. 1, 10 (1989); see also *People v. Tyus*, 2011 IL App (4th) 100168, ¶ 66, 960 N.E.2d 624 ("Although [the] defendant asserts that the package possessed no outward signs of criminal activity because nothing observed by [the police detective] was by itself illegal, this position does not correctly convey the concept of reasonable suspicion. When, as here, a number of otherwise innocent characteristics, taken together, show that a package may contain contraband, reasonable suspicion that a crime is being committed may arise.").

¶ 70    Here, the fact that there might have been an innocent explanation for the presence of the small plastic bag did not preclude Vail and Kaufman from developing a reasonable suspicion that it contained drugs. Incidentally, we note the trial court also appears to have relied on the fact that the small plastic bag was ultimately determined not to have contained a controlled substance when determining no reasonable suspicion for the seizure existed. Specifically, in

its oral ruling, the court stated "there's no indication the baggie contained any drugs" and that "the officer admitted as much." However, we note that the relevant facts for consideration are those that are known to the officer at the time the seizure occurs. In this instance, the small plastic bag was partially obscured, and its contents were unknown at the time of seizure. Accordingly, what was ultimately learned after the seizure about the contents of the small plastic bag was not germane to a reasonable suspicion analysis.

¶ 71 Finally, we agree with the State's contention that the totality of the circumstances presented to the officers at the time of the seizure justified a reasonable suspicion of drug activity. The record shows the police received a report of a suspicious vehicle that did not "check" to the area. (Although Kaufman further testified that the vehicle also did not "check" to defendant, it is unclear when this information became apparent to the officers, as the vehicle did "check" to a male owner and the officers did not learn defendant's identity until well after the seizure occurred.) It was late at night, and the area in which the vehicle was located was known as a "high drug, high crime neighborhood." The officers encountered defendant, an individual without a driver's license sitting in the driver's seat of a parked vehicle, who provided no reason for being at his specific location. Additionally, Kaufman observed a small plastic bag on the passenger-side floorboard. Kaufman testified that, based upon his police training and experience, plastic bags like the one he observed were connected with drug activity. He stated that the small plastic bag was partially concealed under a floor mat and that he suspected that it might contain illegal narcotics. Kaufman testified he, personally, had never seen that type of bag outside of drug sales but agreed that it was not his testimony that such an item had no legitimate purpose.

¶ 72 Thus, while it may not have been immediately apparent that the small plastic bag was connected with drug activity, there was a reasonable suspicion of such activity based on Kaufman's training and experience as a police officer, as well as the other circumstances presented to the officers at the time of the seizure. Although we consider *de novo* whether suppression was warranted under the facts as found by the trial court and accepted on review, we note our agreement with the State's contention that, here, the trial court failed to consider the totality of the circumstances. Specifically, we agree that the court's "bootstrapping" comments suggest it did not consider all of the circumstances—the observation of the plastic bag and the "other factors" present in the case—together to determine whether a reasonable suspicion of criminal activity was justified. However, as expressed "when evaluating the validity of the stop, [courts] consider the totality of the circumstances," *i.e.*, "the whole picture." (Internal quotation marks omitted.) *Timmsen*, 2016 IL 118181, ¶ 9.

¶ 73 Additionally, we note defendant's contention that the State's arguments relative to "bootstrapping" are forfeited based on its failure to cite legal authority "for the proposition that the trial court commits reversible error by using the term 'bootstrapping' in its analysis of the evidence presented at the suppression hearing." See *People v. Snow*, 2012 IL App (4th) 110415, ¶ 11, 964 N.E.2d 1139 (stating that contentions raised in the argument section of the brief must be supported by citation to legal authority and failure to do so results in forfeiture). However, accepting defendant's argument would result in an absurd application of the forfeiture doctrine. Clearly, the State's contention in this instance was that the court, as evidenced by its "bootstrapping" comments, failed to properly analyze the suppression issue by not considering the totality of the circumstances that might justify a reasonable suspicion of criminal activity. The State obviously cited legal authority to support its arguments. It was

not required to cite legal authority specific to the word "bootstrapping." Accordingly, no forfeiture occurred.

¶ 74   Here, the totality of the circumstances—the whole picture—presented to the officers at the time of seizure justified a reasonable suspicion of criminal drug activity such that further investigation was warranted. This is true even if those same circumstances did not amount to probable cause based upon the small plastic bag being distinctly associated with criminal drug activity.

¶ 75                D. Whether the Investigatory Detention Was Unreasonably Prolonged

¶ 76   Finally, we note that before the trial court defendant also argued that the underlying stop was unreasonably prolonged by the call for a K-9 officer and the dog "sniff." He argues that the court's grant of his motion to suppress may be affirmed on this basis. We disagree.

¶ 77   The duration of a traffic stop or investigatory detention "is determined by the seizure's 'mission,' " and a stop or detention "may last no longer than is necessary to effectuate th[at] purpose." (Internal quotation marks omitted.) *Rodriguez v. United States*, 575 U.S. ___, ___, 135 S. Ct. 1609, 1614 (2015); see also *Cosby*, 231 Ill. 2d at 302 ("It is well settled that an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." (Internal quotation marks omitted.)). Additionally, "the police must have reasonable suspicion to justify *detaining* someone for a dog sniff." (Emphasis in original.) *People v. Thomas*, 2018 IL App (4th) 170440, ¶ 56, 115 N.E.3d 325 (citing *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1615).

¶ 78   Here, defendant was not seized until after the police developed a reasonable, articulable suspicion of criminal drug activity. The "mission" of the seizure was to investigate that suspicion. After defendant was seized, Vail called for a K-9 officer, who arrived on the scene four to five minutes later and conducted a dog sniff. Under these circumstances, the officers' investigatory detention of defendant was not unreasonably prolonged.

¶ 79                                III. CONCLUSION

¶ 80   For the reasons stated, we reverse the trial court's grant of defendant's motion to suppress and its suppression of evidence in the case. We remand for further proceedings consistent with this decision.

¶ 81   Reversed and remanded.