2022 IL App (2d) 210752-U
No. 2-21-0752
Order entered December 20, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-2473 |
| PETER E. HOLLAND, | ) ) | Honorable Debra D. Schafer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE McLAREN delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:    There was sufficient evidence for a reasonable jury to infer that defendant touched the victim's breasts for the purpose of his sexual gratification or arousal; the trial court properly denied defendant's motion to suppress his written pretrial statement where he was not in custody and signed a *Miranda* form; and the prosecutor's comments during closing argument were not improper. Trial court is affirmed.

¶ 2    Following a jury trial, defendant, Peter E. Holland, was found guilty of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(d) (West 2018)). The trial court sentenced defendant to 36 months' probation and ordered him to register as a sex offender. On appeal, defendant argues that

1) the evidence was insufficient to prove that he touched the victim's breast for the purpose of sexual gratification or arousal, 2) the trial court erred by denying his motion to suppress his pretrial written statement, and 3) the trial court erred by overruling his objection to the prosecutor's remarks during closing argument. We affirm.

¶ 3                                          I. BACKGROUND

¶ 4     In November 2018, defendant was charged by indictment with three counts of aggravated criminal sexual abuse of a minor, B.B. 720 ILCS 5/11-1.60(d) (West 2018). Count 1 alleged that between January and March 2018, defendant knowingly put his hand on B.B.'s vagina for the purpose of his sexual arousal or gratification. Count 2 alleged that between February and March 2018, defendant knowingly put his penis in B.B.'s mouth. Counts 1 and 2 alleged that at the time of the alleged offenses, defendant was 54 years old and B.B. was 16 years old. Count 3, the count at issue, alleged that between April 2016 and March 2018, defendant knowingly put his hand on B.B.'s breast *for the purpose of his sexual arousal or gratification* and at the time of the alleged offense, defendant was between 52 and 54 years old and B.B. was between 14 and 16 years old.

¶ 5                                     A. Motion to Suppress

¶ 6     In March 2020 defendant filed a motion to suppress his written statement provided to detectives at the Winnebago County Criminal Justice Center (Justice Center), signed and dated, August 15, 2018. Defendant argued that the trial court should bar any statement he provided on August 15, because he asserted his right to remain silent, did not waive his right to remain silent or to counsel, and requested the presence of counsel twice during the interview.

¶ 7     In June 2020 the court held a hearing on defendant's motion to suppress. At the hearing, Winnebago County Sheriff's Detective Mark Jurasek testified as follows. On August 10, 2018, in response to B.B.'s report that defendant inappropriately touched her, Jurasek and Winnebago County Sheriff's Detective Baudelio Juanez went to defendant's home to speak with defendant but

no one was home, so they left a business card. Defendant called Jurasek four days later, and he told defendant that he needed to speak with defendant regarding an ongoing investigation. Defendant voluntarily agreed to come to the Justice Center the next day at 4:15 p.m. Defendant arrived at the scheduled time. Jurasek met defendant at the front desk and walked him to the detective bureau interview room. Jurasek was not in uniform and did not have a firearm. Juanez was with Jurasek and defendant in the interview room. The door was shut for privacy because there were eight other interview rooms nearby. In response to Jurasek's questions, defendant told the detectives that he had graduated high school and could read and write English. Defendant did not appear to be under the influence of drugs or alcohol. Defendant was not in custody and was free to leave, but he was not told so.

¶ 8     Jurasek testified that he showed defendant a *Miranda* rights form. Defendant read and initialed each right and signed the form. It was standard procedure to provide *Miranda* rights to anyone the detectives interviewed. The interview was friendly, cordial, and non-confrontational. Defendant told the detectives that he had known B.B. for approximately two and one-half years, and that B.B. and another young girl helped around his farm with his horses and with hayrides at the apple orchard. Defendant stated that there were times when he was alone with B.B. and the other young girl at his home. On a couple of occasions defendant scratched B.B.'s back and had B.B. sit on his lap. Defendant indicated that, one time, he reached around and touched B.B.'s breast on the outside of her clothing. Defendant stated that when he did that, he immediately realized it was wrong and pulled back.

¶ 9     Jurasek also testified that at this point during the interview, defendant said, "I know what direction this is going, I think I might need an attorney." Jurasek described defendant's statement as ambiguous rather than direct; "he was kind of thinking out loud." The issue of an attorney did not come up again during the rest of the interview.

¶ 10     On August 18, 2018, Jurasek prepared his first report of defendant's interview. Jurasek explained that his reports are summaries used for later recollection. In his first report, he did not quote defendant. Instead, Jurasek's first report states, "at this time [defendant] told us that he no longer felt comfortable talking to us and requested an attorney be present." After speaking with an assistant State's attorney, Jurasek "realized that [he] did not articulate very well in the report what had actually transpired that day." So, on October 17, 2018, Jurasek wrote a second report to clarify what had occurred. In this second report Jurasek quoted defendant as stating, "I know what direction this is going, I think I might need a lawyer." When asked how he interpreted defendant's statement, Jurasek replied:

> "I took it as more as he was thinking out loud. It was a very -- it was a very nonchalant way he said it. It was -- I took it could have went either way, either 'I want an attorney' or I don't -- or 'I might need an attorney at this time.' I don't think it was a direct statement that 'I need an attorney' at that time."

¶ 11     Jurasek also testified that defendant consented to a search of his cellphone. Jurasek and Juanez left the interview room for approximately 90 minutes while the search was completed. When Jurasek returned to the interview room, defendant used the bathroom, and the detectives gave him water.

¶ 12     Detective Juanez testified that while he participated in the interview of defendant, he was not wearing a uniform and did not have a firearm. Defendant was not under arrest and was free to leave. Defendant was cooperative and the interview was cordial. Defendant referred to an attorney "like he was thinking out loud." Juanez paraphrased defendant's remark as "I know where this is going, I might want an attorney present." Juanez did not interpret defendant's statement as a request for an attorney. Juanez told defendant that they wanted to get his side of the story, and

defendant continued talking. After defendant's statement was reduced to writing he initialed and signed the statement. After the interview, defendant was escorted out of the Justice Center.

¶ 13    In ruling on defendant's motion to suppress, the trial court found that defendant was not in custody at the time he provided his statement under the factors established in *People v. Slater*, 228 Ill. 2d 137 (2008). The trial court also found that a reasonable person innocent of any crime would have believed that he was free to go, under the circumstances. The court found that defendant's statement was voluntary. In addition, the trial court found that defendant's reference to an attorney was "not an unequivocal request for counsel." The court found that the quote contained in Jurasek's second report "most closely resemble[d] what defendant said at the time" and that the statement contained in Jurasek's first report was a summary. The court noted that Jurasek and Juanez testified that the second report more closely resembled what defendant said. The court concluded, however, that it did not need to address the issue because the interrogation was non-custodial. Accordingly, the trial court denied defendant's motion to suppress his written statement.

¶ 14                                    B. Trial

¶ 15    B.B. testified as follows. B.B., born in August 2002, knew defendant from helping him with horses. T.A., a minor at the time of the relevant events, lived across the street from defendant and was a family friend. B.B. knew T.A. because she was B.B.'s niece. B.B. loved animals and horses in particular. Defendant liked people to help with his horses. On Fridays B.B. would sleep at defendant's home and get up early the next day to take his horses to the orchard and to work. Usually, T.A. slept at defendant's home on Friday nights, but there were a couple of times that B.B. was at defendant's home by herself. Defendant was married, but he did not have children. During the evening, defendant's wife went upstairs to bed, and B.B. did not see her for the rest of the night. Defendant stayed downstairs and they watched movies while sitting on his couches.

¶ 16    B.B. testified that, when she was 13 or 14 years old, during the first six months that she went to defendant's home, defendant asked B.B. and T.A. to sit on his lap and show him pictures on their phones. Defendant also asked for back rubs. B.B. rubbed defendant's back and defendant rubbed B.B.'s back. Defendant also tickled B.B. almost every time she was at his home. When defendant tickled B.B. he would "play it off like was just tickling me but he would touch my breasts." He touched her breasts over her clothing. When T.A. was present, defendant tickled B.B. but never touched her breasts. One time, defendant touched B.B.'s breasts while they were in the apple orchard before it opened. He also touched her breasts a few other times but always while he was tickling her. B.B. also testified that defendant rubbed her butt over her clothing during a massage.

¶ 17    When B.B. went to bed at defendant's home, he kissed her on the cheek initially, and later defendant kissed her on the lips. One time defendant tried to French kiss B.B., meaning that defendant "[s]tuck his tongue out." B.B. did not tell anyone about defendant's behavior because she "really liked being able to be with animals."

¶ 18    B.B. continued to testify as follows. The bathroom at defendant's home had a couple of windows and the bathroom door had a keyhole that one could see through. T.A. warned B.B. about the bathroom so they usually went to the bathroom together. They stuffed toilet paper in the keyhole to stop defendant from looking at them. On one occasion, while B.B. was in the bathroom, she went to fix the open window blind and saw defendant outside looking at her.

¶ 19    B.B. testified that during one of the last times she was at defendant's home, defendant grabbed her hair and pulled her to him. When B.B. turned around defendant had exposed his penis. B.B. testified, "and I – and he – I put my mouth on his penis." Also, during one of the last times B.B. was at defendant's home, he put his hand down B.B.'s pants and rubbed her vagina. After

B.B. squirmed away defendant asked her if she liked her massage. Later, when B.B. was alone in defendant's home, she called her mother to pick her up.

¶ 20    T.A. testified that B.B. is her aunt and friend, and defendant was a family friend. When T.A. was 11 years old she began spending the night at defendant's home to help with the horses. She invited B.B., who also loved horses. T.A. and B.B. slept in the living room on an air mattress and watched T.V. Defendant's wife went to bed early and was not present the last couple of hours T.A. and B.B. were awake.

¶ 21    T.A. testified that when she was younger, she sat on defendant's lap and showed him pictures on her phone. When she got older and learned to speak up for herself, she stopped sitting on defendant's lap. B.B. sat on defendant's lap frequently and did not stop sitting on defendant's lap. When defendant tucked T.A. into bed he leaned in close and kissed her on her check. Defendant also kissed B.B. every time they stayed the night. One time, when T.A. was 14 years old, defendant said that T.A.'s bra was "extra tight." On another occasion, as T.A. was getting into defendant's truck, he slapped T.A. on the butt. While they were in the truck on the way to an auction, defendant grabbed T.A.'s mid-thigh, inside between her legs. Defendant frequently grabbed T.A.'s thigh when they rode together in his car. Defendant also tickled T.A.

¶ 22    T.A. also testified that defendant tickled B.B. at least ten times. It seemed sexual, and T.A. felt uncomfortable because, "it wasn't normal [and] it felt like something a grown man should not be doing." When T.A. watched defendant tickle B.B., defendant focused the tickling "very close to the feminine body parts." It felt like it was almost foreplay. T.A. stopped going to defendant's home after she posted a video of her younger sister wearing "short shorts" and defendant took a screenshot of it.

¶ 23    Detective Juanez testified as follows. He and Detective Jurasek typed defendant's statement and gave him the opportunity to read it and make any changes he felt were appropriate.

Defendant wrote "the end" at the end of the statement and signed and dated the statement. The written statement was completed at 7:50 p.m. The statement indicated defendant's date of birth as December 21, 1964. At the time defendant provided the statement, he told the detectives he was 53 years old. Over objection, defendant's written statement was published to the jury. Juanez read the statement to the jury as follows:

"My name is Peter Holland. I live at *** with my wife. Approximately two years ago I met [B.B.] through my neighbor across the street. My neighbor – my neighbor's great granddaughter [T.A.] is related to [B.B.]. It is my understanding that [B.B.] had a very rough childhood, childhood. My wife and I were able to -- my wife and I were not able to have children. Since we were not able to have children[,] we have tried to help out children whenever we can and we enjoy having children around the house. [B.B.] and [T.A] both expressed interest in horses. My wife and I have 23 horses[,] so we invited [T.A.] and [B.B.] to come over to the house and help us with the horses on several occasions. [B.B.] and [T.A.] spent the night at our house approximately six or eight times over the two-year period. Generally[, B.B.] and [T.A.] stayed the night at our house together. There were a few occasions when [B.B.] stayed by herself at our house. When [B.B.] started to come over to our house, she was 13 years old. Generally, the reason [B.B.] would stay at our house is because she would need help -- because we would need -- because she would need to help with the horses early in the morning and/or we would go to auctions together. It was more convenient if [B.B.] stayed the night. [B.B.] has not stayed at our house since April of this year. [B.B.] and I had tickle fights on several occasions. I like to tickle people[,] and this was somewhat normal for me to do. Generally[,] I would tickle [B.B.] on the side of her -- on the side or her flank area. On one or two occasions I accidentally reached around to the front of [B.B.] while I was tickling her. When I accidentally reached

around to her front, I accidentally touched the side of her breast. When I did this, it was on the outside of her clothing. I never touched her under her clothing. Both times after I did it I realized what I did was wrong and immediately pulled my hands away from her clothing. I'm sorry. Immediately pulled my hands away from her breasts. On a few occasions [B.B.] rubbed my back. I also rubbed [B.B.]'s back on a few occasions. This was always on the outside of the clothing and was never under the clothing or on bare skin. On five or six occasions I slapped [B.B.] on her rear end when we were in the barn taking care of horses. One time [B.B.] was in the bathroom and I looked through the outside bathroom window at [B.B.] in the bathroom. [B.B.] was dressed when I did this. There were two occasions when I looked through the keyhole in the bathroom when [B.B.] was in the bathroom. We have an older house[,] and the doors have the older skeleton-style keyholes. When I looked through the keyhole, I saw [B.B.] in her panties with a T-shirt on. I never saw [B.B.] naked in the bathroom. I know what I did was wrong though it sexually aroused me. I know what I did with [B.B.] was wrong and I went past the limits. Since I was sexually aroused by what happened, I went upstairs with my wife in the bedroom and ultimately had sex with her."

¶ 24    The State rested. Defendant moved for a directed verdict, which the trial court denied.

¶ 25    Serena Brettschneider testified on behalf of defendant. She took care of defendant's horses every weekend in the fall. Brettschneider rarely saw B.B. or T.A. and saw no sexual physical contact between defendant and the girls. Occasionally defendant tickled or poked someone to "scooch over." Defendant had tickled Brettschneider, but he never accidentally touched her breasts. In the summer of 2018 defendant told Brettschneider that B.B. was no longer welcome at the horse farm because "she had gotten herself into some trouble at school with drugs or other things."

¶ 26    Julie Holland, defendant's wife testified as follows. She never saw anything uncomfortable when B.B. visited. Julie did not invite B.B. or T.A. to her home nor did she text them. Julie found toilet paper in the keyhole of the bathroom door. B.B. and T.A. spent the night and slept downstairs. Most of the time Julie went upstairs to bed early.

¶ 27    On April 6, 2018, Julie scolded B.B. when B.B. began to take off her pants in front of Julie and defendant in the living room. Julie told defendant it was not a good idea to have B.B. around anymore. After a snapchat post about fireworks and drugs, Julie told defendant to tell B.B. she was no longer welcome at the horse farm.

¶ 28    Defendant testified that in 2018 he was 53 years old and B.B. was 13 years old. At that time, B.B. sat on his lap. Defendant tickled B.B. and T.A. but it was not sexual. Defendant saw B.B. through the bathroom window and looked at her through the bathroom keyhole twice. He saw B.B. moving around in the bathroom wearing a T-shirt and panties. Defendant watched for two seconds and looked away. When asked why he looked away if he was sexually aroused, defendant replied, "Because I went upstairs to see my wife after I got my boots off and stuff." When asked again if he was sexually aroused by seeing B.B. in the bathroom, defendant replied, "It was a Saturday night, which married families that both work, it was kind of our normal time." Defendant denied that he fondled B.B.'s breasts for sexual gratification, that he put his hand down B.B.'s pants, or that he put his penis in B.B.'s mouth.

¶ 29    Defendant testified that he invited B.B. back to the horse farm on April 30, 2018, despite the claim that she had undressed in the living room. Defendant never told the detectives that B.B. did anything wrong, that she was not invited back, that B.B. had undressed, or that she posted on snapchat in July 2018.

¶ 30    The jury found defendant guilty of aggravated criminal sexual abuse in that defendant placed his hand on B.B.'s breast for the purpose of his sexual gratification or arousal (count 3).

The jury found defendant not guilty of aggravated criminal sexual abuse in that defendant placed his hand on B.B.'s vagina (count 1), and that defendant sexual penetrated B.B. by placing his penis in B.B.'s mouth (count 2).

¶ 31    Defendant filed a posttrial motion arguing that the trial court erred by admitting his written statement and that during closing argument the prosecutor shifted the burden of proof. After argument on the motion, the trial court denied it, "for reasons cited in the record." On December 15, 2021, the trial court sentenced defendant to 36 months' probation and ordered defendant to register as a sex offender. The following day, defendant filed a timely notice of appeal.

¶ 32                                    II. ANALYSIS

¶ 33    Initially, we address the State's argument that defendant has forfeited his arguments regarding the sufficiency of the evidence and the denial of his motion to suppress evidence because his statement of facts is incomplete in violation of Illinois Supreme Court Rule 341(h)(6). See Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020) (made applicable to criminal cases by Illinois Supreme Court Rule 612(b)(9) (eff. July 1, 2017)). Rule 341(h)(6) requires a statement of facts that contains the facts "necessary to an understanding of the case, stated accurately and fairly without argument or comment." Ill. S. Ct. R. 341(h)(6). We may strike a statement of facts when the improprieties hinder our review. *Hall v. Naper Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 9.

¶ 34    Here, defendant's statement of facts is woefully incomplete as it contains only those facts helpful to defendant's case. In addition, it contains argument. However, the facts necessary to understand the case are contained in the State's statement of facts, as permitted by Rule 341(i). Ill. S. Ct. R. 341(i) (eff. Oct. 1, 2020) (a statement of facts "need not be included" in an appellee's brief "except to the extent that the presentation by the appellant is deemed unsatisfactory" by the appellee). Accordingly, defendant's argument regarding the sufficiency of the evidence is not

forfeited. However, we will disregard all argument contained in defendant's statement of facts. We now turn to the merits of defendant's argument regarding the sufficiency of the evidence.

¶ 35                                A. Sufficiency of the Evidence

¶ 36    Defendant argues that there was insufficient evidence to prove him guilty beyond a reasonable doubt of aggravated criminal sexual abuse. In particular, defendant contends that the State failed to prove that he touched B.B.'s breast for the purpose of sexual gratification or arousal. The State counters that it proved the element of sexual gratification or arousal by circumstantial evidence.

¶ 37    When faced with a challenge to the sufficiency of the evidence, we ask whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Belknap*, 2014 IL 117094, ¶ 67. This standard applies whether the evidence is direct or circumstantial. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). The trier of fact resolves conflicts in the testimony, weighs the evidence, and draws reasonable inferences from basic facts to ultimate facts. *People v. Brown*, 2013 IL 114196, ¶ 48. Accordingly, we will not retry the defendant or substitute our judgment for that of the trier of fact on the weight of the evidence or credibility of witnesses. *Id.* We must allow all reasonable inferences from the record in favor of the prosecution. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)). We will not reverse a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt. *People v. Gray*, 2017 IL 120958, ¶ 35.

¶ 38    To convict defendant of aggravated criminal sexual abuse as charged in count 3, the State was required to prove beyond a reasonable doubt that defendant (1) knowingly touched or fondled the breasts of the victim, (2) for the purpose of sexual gratification or arousal, (3) the victim was

at least 13 years of age but under 17 years of age, and (4) defendant was at least 5 years older than the victim. 720 ILCS 5/11-0.1, 11-1.60(d) (West 2018).

¶ 39    Here, defendant challenges only the sufficiency of the evidence regarding the intent element. Generally, the intent element, that the defendant committed the act for the purpose of sexual gratification or arousal, cannot be proved by direct evidence. *People v. Holmes*, 2018 IL App (3d) 160060, ¶ 20. It is typically established by circumstantial evidence based on the totality of the circumstances, such as a defendant's statements and actions. *People v. Burton*, 399 Ill. App. 3d 809, 813 (2010). In addition, a defendant's intent to sexually gratify or arouse himself can be inferred solely from the nature of the act. *Id.* at 813-14 (holding that the defendant's act of touching the victim's breasts inside her bra was sufficient for the trial court to reasonably infer that the defendant intended to gratify or arouse himself).

¶ 40    Defendant argues that there is no evidence in the record, direct or circumstantial, that he touched B.B.'s breast for the purpose of his sexual gratification of arousal. Defendant asserts that his written statement proves that he touched B.B.'s breast accidentally. Defendant quotes from his written statement as such: "On one or two occasions I accidentally reached around to the front of [B.B.] while I was tickling her. When I accidentally reached around to her front[,] I accidentally touched the sides of her breast."

¶ 41    Here, defendant's omissions from his statement speak volumes. After defendant's statement quoted above, he stated, "Both times after I did it [touched B.B.'s breasts] I realized what I did was wrong and immediately pulled my hands away from her clothing. I'm sorry. Immediately pulled my hands away from her breasts." In addition, defendant omits the litany of inappropriate conduct toward B.B. contained in his written statement, including having tickle fights with her, slapping her on the "rear end" six times, rubbing her back, looking through the keyhole in the bathroom door while she was there "in her panties and a T-shirt." Regarding that

- 13 -

last act defendant stated, "I know what I did was wrong though it sexually aroused me." In addition, B.B. testified that defendant attempted to French kiss her, touched her vagina, and rubbed her "butt." Taken together, any reasonable jury could reasonably and readily infer from this evidence that defendant touched B.B.'s breasts for the purpose of sexual gratification or arousal. Therefore, the evidence proved beyond a reasonable doubt all the elements of the offense.

¶ 42                     B. Defendant's Written Statement

¶ 43    Defendant argues that the trial court erred by denying his motion to suppress his written statement and by overruling his objection to its admission at trial. The State initially contends defendant has forfeited our consideration of this argument because he failed to provide us with a complete record. The State specifically notes the absence of the transcript of the hearing on defendant's posttrial motion. The record contains an order sating that the court denied defendant's posttrial motion "for reasons cited in the record."

¶ 44    The State cites several cases that stand for the proposition that it is the appellant's responsibility to provide a complete record and any doubts arising from the provision of an incomplete record must be resolved against the appellant. The State also cites Illinois Supreme Courts Rules of Illinois Supreme Court Rule 321 (eff. Oct. 1, 2021) and Rule 323 (eff. July 1, 2017). Ill. S. Ct. R. 321 (requiring the record on appeal to contain, *inter alia* "any report of proceedings prepared in accordance with Rule 323"); Ill. S. Ct. R. 323(a) (providing, in part, "[a] report of proceedings may include evidence, oral rulings of the trial judge, a brief statement of the trial judge of the reasons for his decision, ***. The report of proceedings shall include all the evidence pertinent to the issues on appeal.")

¶ 45    We agree with the State that the burden rests on the appellant to provide a sufficient record to support the claim of error, and, in the absence of such a record, we presume that the trial court's order was in conformity with established legal principles and had a sufficient factual basis. *Foutch*

*v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). However, while the appellant has a duty to present an adequate record, appellate review is not always precluded. *In re Marriage of Martins*, 269 Ill. App. 3d 380, 387 (1995). Appellate review is permitted where the record contains that which is necessary to dispose of the issues in the case. *Id.* "Economy is best served by only requiring that the record on appeal contain that which is necessary." *Id.*

¶ 46    Here, the error alleged by defendant occurred at the hearing on his motion to suppress his written statement and during trial, and not at the hearing on his posttrial motion. A transcript of the hearing on the motion to suppress and the trial are contained in the record on appeal. The State does not allege the trial court received any additional evidence at the hearing on defendant's posttrial motion. Therefore, the absence of a transcript of the hearing on the posttrial motion does not preclude our review of the propriety of the trial court's denial of defendant's motion to suppress or its admission of defendant's written statement. We now address the merits of defendant's argument.

¶ 47    Defendant contends that the court incorrectly weighed the factors set forth in *People v. Slater*, 228 Ill. 2d 137 (2008), and erred by finding that he was not in custody at the time he provided the statement and by finding he provided the statement voluntarily. The State counters that the trial court properly denied defendant's motion to suppress because his statement was non-custodial and voluntary.

¶ 48    A trial court's decision on a motion to suppress is reviewed under a two-part standard. *In re D.L.H.*, 2015 IL 117341, ¶ 46. Factual findings of the trial court will be reversed only if they are against the manifest weight of the evidence, but the ultimate legal determination regarding whether suppression is warranted is reviewed *de novo*. *Id.* A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding is unreasonable, arbitrary, or not based on the evidence. *People v. Relwani*, 2019 IL 123385, ¶ 18.

¶ 49    Defendant challenges the trial court's findings that he was "not in custody" when he made incriminating statements and that he made the statements voluntarily. We disagree with defendant.

¶ 50    Under *Miranda*, to protect a defendant's fifth amendment right against self-incrimination, prior to any custodial interrogation of the defendant, he must be advised that he has a right to remain silent, that any statement he makes may be used as evidence against him, and that he has the right to have an attorney present, whether retained or appointed. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Statements resulting from custodial interrogation that occur prior to the giving of these warnings are not admissible evidence. *Id.*

¶ 51    In explaining just when the requirement to provide *Miranda* warnings applies, the Supreme Court clarified that "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. In other words, *Miranda's* protections apply where a defendant is both (1) in custody and (2) subjected to interrogation. *Id.* at 467-68. See also *People v. Sims*, 2021 IL App (2d) 200391, ¶ 138.

¶ 52    When examining whether a defendant is in custody, we first examine the circumstances surrounding the claimed interrogation to determine whether a reasonable person, under those circumstances, would have felt that he or she was at liberty to terminate the interrogation and leave. *Slater*, 228 Ill. 2d at 150. Our supreme court identified six factors to consider in determining whether a statement was made in a custodial setting. These factors are:

> "(1) the location, time, length, mood, and mode of questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking or fingerprinting; (5) the manner by which

the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the accused." *Id.*

¶ 53     The first factor—the location, time, length, mood, and mode of questioning—cuts in favor of a conclusion that defendant was not in custody at the time he made the statements. Defendant was at the police station when he provided the statements. The testimony indicates that the mood was cordial and friendly. Defendant remained at the police station for approximately three and one-half hours beginning at 4:15 p.m. However, he was questioned for about only two hours of that time, because no questioning occurred for about 90 minutes while the detectives left the interview room after defendant agreed to a search of his cellphone. Five minutes after defendant arrived at the police station, he signed a form advising him of his *Miranda* rights. During the interview, defendant was provided with water and used the restroom.

¶ 54     Defendant argues that the detectives knew the interrogation was custodial because they had him sign the *Miranda* form. However, a custodial situation cannot be created by the mere giving of *Miranda* warnings. *People v. Vasquez*, 393 Ill. App. 3d 185, 192 (2009).

¶ 55     The second and third factors – the number of police officers present and the presence of family and friends – cut in favor of no conclusion because there were only two detectives present and there was no evidence that defendant requested the presence of family or friends and was denied such.

¶ 56     The fourth factor – any indicia of a formal arrest procedure – favors a finding that defendant was not in custody at the time he made the statements. There were no indicia of formal arrest. There was no evidence that defendant was handcuffed, booked, or fingerprinted. The detectives were not in uniform, did not display firearms, and did not restraint defendant in any way. Although detectives had possession of defendant's cellphone for about 90 minutes, defendant consented to providing it to them. Therefore, this factor favors a conclusion that defendant was not in custody.

¶ 57    The fifth factor — the manner that defendant arrived at the location of the questioning — also cuts in favor of a conclusion that defendant was not in custody. Defendant made an appointment to meet the detectives for his interview, and he arrived at and exited the Justice Center voluntarily.

¶ 58    Finally, nothing in the evidence suggests that defendant's age, intelligence, or mental makeup in any way hindered his ability to understand his conversation with the detectives or its implications. At the time of his statements, defendant was 53 years old and married. He had graduated high school and could read and write English. Defendant did not appear to be intoxicated.

¶ 59    After examining and weighing the relevant factors, we determine that a reasonable person, innocent of any crime would have believed that he could terminate the encounter and was free to leave. We note that after the interview, defendant did, in fact leave the Justice Center. Therefore, the trial court's finding that defendant was not in custody is not against the manifest weight of the evidence.

¶ 60    Defendant also argues that his "request to speak with counsel [was] improperly denied by the police [such that his] will was overborne at the time he provided" his statement. Defendant notes that a report prepared by Detective Jurasek provided, "At this point [defendant] told us that he was no longer comfortable talking to us and requested an attorney be present."

¶ 61    Defendant's argument is forfeited pursuant to Illinois Supreme Court Rule 341(h)(7) (eff. Oct 1, 2020). Rule 341(h)(7) requires an appellant to adequately develop his argument with citation to relevant authority. *Id.* We are entitled to have issues clearly defined with relevant authority cited and cohesive arguments presented. *People v. Rosalez*, 2021 IL App (2d) 2000086, ¶ 170. Further, we are not a repository for an appellant to foist his burden of argument and research. *Id.* Failure to comply with Rule 341(h)(7) may result in forfeiture. *People v. Ward*, 215 Ill. 2d 317, 332 (2005)

(a point raised in the brief but not supported by citation to relevant authority is forfeited); *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 12 (plaintiff's argument, that consisted of two conclusory paragraphs, was forfeited for failure to comply with Rule 341(h)(7)). Here, defendant's argument consists of a conclusory phrase, incoherent sentences, and no citation to authority. Therefore, forfeiture is appropriate.

¶ 62    Absent forfeiture, defendant's argument would fail. "In order to invoke the *Miranda* right to counsel, an individual must be both in custody and subject to interrogation or under imminent threat of interrogation." *People v. Villalobos*, 193 Ill. 2d 229, 241-42 (2000). Because we have determined that the trial court properly found that defendant was not in custody at the time he made the incriminating statements, we need not determine whether defendant invoked his right to counsel. See *Edwards v. Arizona*, 451 U.S. 477, 486 (1981) (holding that the right to counsel established in *Miranda* does not extend outside of the occurrence of custodial interrogation).

¶ 63    Further, even if defendant could establish that he was in custody, his argument would fail because he did not invoke his right to counsel. The question of whether a defendant's statements made during custodial interrogation can be used against him depends on "whether the accused actually invoked his right to counsel." *Christopher K.*, 217 Ill. 2d 348, 376 (2005). This determination is an objective inquiry. *Id.* at 378 (quoting *Davis v. United States*, 512 U.S. 452, 459 (1994)).

> "According to the [*Davis*] Court, 'if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel,' the officer is not required to cease questioning the suspect. (Emphasis in original.) [Citation.] The Court went on to state that a suspect 'must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand

the statement to be a request for an attorney.' [Citation.]" *Christopher K.,* 217 Ill. 2d at 378-79.

See also *People v. Harris*, 2012 IL App (1st) 100678, ¶ 69 (stating "the invocation must be sufficiently free from indecision or double meaning so as to reasonably inform authorities that the accused wishes to speak to counsel"). Further, although there are no specific words that a defendant must use to invoke the right to counsel, the mere mention of a lawyer or an attorney by a defendant to the police is insufficient. *People v. Brickhouse*, 2018 IL App (3d) 150807, ¶ 42.

¶ 64    Here, defendant insists that the trial court should have found that Jurasek's first report was the most reliable indicator of his reference to an attorney. In that report Jurasek stated, "at this time, [defendant] told us that he no longer felt comfortable talking to us and requested an attorney." However, after considering the testimony of the detectives, the trial court found that this statement was a summary of defendant's reference to an attorney, and that the quote contained in Jurasek's second report more closely resembled what defendant said. Jurasek's second report quoted defendant as saying: "I know what direction this is going. I think I might need a lawyer." The court's finding was supported by the detectives' testimony. Jurasek testified that defendant said, "I know what direction this is going, I think I might need an attorney." Similarly, Juanez paraphrased defendant as saying, "I know where you are going, I might want an attorney." Therefore, the trial court's finding regarding defendant's reference to an attorney is not against the manifest weight of the evidence.

¶ 65    Further, the trial court properly found that defendant's reference to an attorney was "not an unequivocal request for counsel." See *People v. Krueger*, 82 Ill. 2d 305 at 311-12 (1980) (holding that the defendant's remarks, "maybe I need a lawyer" and "maybe I ought to talk to an attorney" did not invoke his right to counsel); *People v. Tackett*, 150 Ill. App. 3d 406, 419 (1986) (holding that the defendant's statement, "I might be needing [an attorney]," and "I probably should[,]" made

in response to the officer's statement that an attorney would be made available to him, was an insufficient manifestation of an invocation of his right to counsel). See also *Brickhouse*, 2018 IL App (3d) 150807, ¶¶ 31, 43 (holding that the defendant asking a police officer "about a lawyer" during questioning was ambiguous and not a clear request for an attorney). Accordingly, even if defendant had preserved the argument that he invoked his right to counsel, his argument that the trial court erred by denying his motion to suppress his statements would fail.

¶ 66                    C. Prosecutor's Comments During Closing Argument

¶ 67    Defendant argues that the prosecutor improperly shifted the burden of proof during closing argument and that the trial court erred by overruling defendant's objection. The State contends that the prosecutor properly commented on the purpose of circumstantial evidence and therefore, the trial court did not err by overruling defendant's objection.

¶ 68    A defendant has no duty to produce evidence at trial, and the State may not shift the burden of proof to a defendant. *People v. Williams*, 2022 IL 126918, ¶ 44. However, a prosecutor has wide latitude in closing argument and may comment on the evidence and any reasonable inferences that arise from it, even if such inferences are unfavorable to defendant. *Id.*

¶ 69    Defendant disputes two comments made by the prosecutor during closing argument. The first comment is italicized at the end of the following paragraph:

> "One aspect of this is you have to prove the arousal of the defendant. Well, for those particular acts at the time, you're not going to be able – there is no evidence and it's almost impossible to show the defendant was sexually aroused unless he admitted it. So what do you do to determine that component of this charge, of this requirement? You're going to receive an instruction on circumstantial evidence. And circumstantially you can show that *why would you touch someone's vagina other than for sexual arousal, sexual gratification*." (Emphasis added.)

At this point, defense counsel objected, arguing that the prosecutor had shifted the burden by asking, "[w]hy else would you touch somebody's breast?" The court corrected defense counsel, stating that the prosecutor said "vagina." Defense counsel acknowledged the correction and argued "[y]ou cannot shift the burden to have [defendant] explain why he touched the vagina." The trial court overruled the objection.

¶ 70    Yet, in his posttrial motion, defendant mischaracterized the prosecutor's remark by stating, "During the State's closing argument, undersigned counsel contemporaneously objected to the prosecutor's argument asking the jury 'why else would the defendant have touched [B.B's] breast.'" Further, on appeal, defendant persists in mischaracterizing the prosecutor's remark, stating that the prosecutor "misspoke" when he used the word "vagina" when he clearly meant "breast." We note that although the jury found defendant guilty only of touching B.B.'s breast, he was also charged with touching her vagina. Therefore, defendant's contention that the prosecutor misspoke when he used the word "vagina" is without support in the record.

¶ 71    We further note that defendant did not include the prosecutor's comment ("why would you touch someone's vagina other than for sexual arousal, sexual gratification") in his posttrial motion. Thus, this issue is forfeited. See *People v. Sebby*, 2017 IL 119445, ¶ 48 (holding that to preserve a purported error for consideration by a reviewing court, a defendant must both object to the error at trial and raise the error in a posttrial motion).

¶ 72    But even if this issue were properly preserved, the prosecutor's comment is not reversible error. Even if a prosecutor's closing remark is improper, it does not constitute reversible error unless it results in substantial prejudice to the defendant, such that absent the remark the verdict would have been different. *People v. James*, IL App (1st) 180509, ¶ 39. Here, defendant cannot establish that the alleged improper remark substantially prejudiced him because he was acquitted

of aggravated sexual abuse by touching B.B.'s vagina. Therefore, even if defendant had not forfeited this issue, his inaccurate argument fails, and reversal is not warranted.

¶ 73   Defendant disputes a second comment. He again argues that the prosecutor shifted the burden of proof. The statement at issue was made immediately following the court's overruling of the objection to the previous comment and is in italics:

> "You have to look at the act and all the facts around it. And circumstantially, why would you touch someone's vagina? Why would you give them a massage on their vagina? *Why would you touch their breast? [Defendant] said accidentally.* Hey, if it happened once, why would it happen again?"

¶ 74   Defense counsel failed to object to this comment, and, therefore, has forfeited this issue. *Sebby*, 2017 IL 119445, ¶ 48. Absent forfeiture, we reject defendant's challenge because the prosecutor did not shift the burden of proof to defendant.

¶ 75   Defendant contends that the prosecutor shifted the burden of proof because defendant had "already provided a benign and non-sexual explanation that his hand made accidental contact with [B.B.]'s clothed breast." Defendant also argues that the prosecutor improperly drew attention to defendant's "alleged unbelievability," and "task[ed] the jury to consider the absence of any other explanation" to be circumstantial evidence of sexual gratification or arousal.

¶ 76   Viewing the closing arguments in their entirety, however, we conclude the prosecutor's comment did not shift the burden of proof to defendant. Prosecutors are allowed to comment on the evidence and reasonable inferences from the evidence, including a defendant's credibility or the credibility of the defense's theory of the case. *People v. Williams*, 2015 IL App (1st) 122745, ¶ 12. The intent to sexually gratify or arouse can be inferred solely from the nature of the act. *Burton*, 399 Ill. App. 3d at 813. Here, defendant admitted that he was sexually aroused by B.B.

and that when he touched her breasts on two separate occasions, he knew it was wrong. Thus, the prosecutor's comment, which questioned defendant's benign explanation, was not improper.

¶ 77                         III. CONCLUSION

¶ 78     The judgment of the circuit court of Winnebago County is affirmed.

¶ 79     Affirmed.