THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. SANDRA VASQUEZ, Defendant-Appellee.

Second District   No. 2—07—1204

Opinion filed July 14, 2009.

Eric C. Weis, State's Attorney, of Yorkville (Lawrence M. Bauer and Gregory L. Slovacek, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Kathleen Colton, of Law Offices of Kathleen Colton, Ltd., of Batavia, for appellee.

JUSTICE JORGENSEN delivered the opinion of the court:

The State appeals from an order of the circuit court of Kendall County suppressing statements made by defendant, Sandra Vasquez, during a videotaped interview with police. The interview took place in a room in the intensive care unit (ICU) of a hospital where defendant was recovering from injuries suffered in a motor vehicle accident that claimed the lives of five others. At the time of the interview, defendant had already been ticketed for driving under the influence of alcohol (DUI) (625 ILCS 5/11—501(a)(2) (West 2006)) and had been released on a recognizance bond. She was later charged—first by information and then by indictment—with multiple counts of aggravated DUI (625 ILCS 5/11—501(d)(1)(C), (d)(1)(F) (West 2006)) and reckless homicide (720 ILCS 5/9—3(a) (West 2006)). At issue in this appeal is whether defendant's statements were taken in violation of her right to counsel under *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), or under the sixth amendment to the United States Constitution (U.S. Const., amend. VI). We conclude that there was no violation of either right and that the suppression of defendant's videotaped statements was error. Accordingly, we reverse the suppression order and remand for further proceedings.

The accident occurred on Route 31 in Oswego during the early morning hours of February 11, 2007. Only a single vehicle was involved. At the suppression hearing, Oswego police officer Chad Vargas testified that he investigated the accident. He initially spent some time at the accident site, and at about 3:30 a.m. he accompanied another Oswego police officer, Jason Bastin, to an Aurora hospital where defendant and another survivor of the accident, Arielle Rexford, had been taken for treatment. Bastin spoke with Rexford, and Vargas briefly spoke with defendant in the emergency room. Vargas asked defendant if she had driven the vehicle involved in the accident. She

said that she was not driving, because she was too drunk; someone named James was driving. Following that conversation, Vargas conferred with Bastin, who reported that Rexford had described the driver of the vehicle as a Hispanic woman wearing a red jacket. Vargas had seen defendant wearing a red jacket at the accident site. Vargas and Bastin then approached defendant, and Vargas advised her that a witness had indicated that she was the driver. Defendant stated that she did not like the way James was driving, so she had him pull over, and she got behind the wheel. Defendant stated that she was probably driving when the accident occurred, but she later indicated that she could not remember.

Oswego police officer Jeff Burgner testified that, on the date of the accident, he was assigned to the Kendall County Major Crimes Task Force (Task Force). At 8 or 9 a.m. that day he attended a briefing with other law enforcement officers, including John Mall, a detective with the Oswego police department. Bob Dore, an assistant State's Attorney, was also present. Burgner testified that he could not recall whether Dore asked him to interview Vasquez. After reviewing a police report that he had prepared, Burgner indicated that both his supervisor on the Task Force and Dore requested that he interview defendant. At the briefing, Burgner learned that the accident had resulted in fatalities and that defendant had been ticketed for DUI and released on her own recognizance.

After the briefing, Burgner and Mall traveled to the hospital where both defendant and Rexford were being treated. Burgner and Mall were not in uniform; both were wearing jeans and "polo-style" shirts. Burgner had a holstered handgun at his hip, and he believed that Mall did also. Burgner had no occasion to remove his weapon from its holster that day. Burgner and Mall arrived at the hospital at about 10 or 11 a.m. and Burgner had a conversation with Rexford. After that conversation, Burgner spoke with a registered nurse at the nurse's station in the ICU. The nurse advised Burgner where defendant's room was located and did not indicate any reason why Burgner and Mall could not speak with defendant. Burgner testified that he and Mall visited defendant in her room at about 1 p.m. The room had a sliding glass door with a curtain for privacy. Burgner did not indicate whether the door was open or closed, or whether the curtain was drawn, when he and Mall reached defendant's room.

Burgner and Mall introduced themselves, and Burgner explained that they had come to speak with defendant about the accident. Defendant was in bed, and her parents were in the room. Burgner asked defendant's parents to leave while he and Mall spoke with defendant. Defendant's parents complied with the request. The

conversation that followed was recorded on videotape. Burgner advised defendant that they were going to have a "Q&A" session; he and Mall were going to ask her questions and she would be able to ask them questions. Burgner further stated, "Due to the fact, you know, obviously, that we're sitting here and you can't, obviously, get up and walk out [inaudible] can't walk out of the room on your own, there's something I need to read to you *** and as a courtesy to you, I'm gonna read it over to you, and I'm gonna obviously ask if you have any questions and understand it." Reading from a preprinted form, and speaking very quickly, Burgner recited the *Miranda* warnings. He then asked defendant, "Do you understand those? Do you have any questions about those?" Defendant shook her head to indicate "no." Burgner testified that he did not know whether defendant had shaken her head to indicate that she had no questions or to indicate that she did not understand her rights. The questioning that followed lasted roughly 35 minutes, during which time defendant related that she was, in fact, behind the wheel at the time of the accident. About 25 minutes into the interview (after acknowledging that she was driving when the accident occurred), defendant stated, "I don't want to talk any more." Burgner then told defendant that she could take a break. Defendant indicated that she wanted to see her mother, but almost immediately asked Burgner if he knew what was going to happen to her. Burgner indicated that he could not answer because it was up to the State's Attorney (not Burgner) to decide. However, Burgner explained to defendant that she had been arrested for DUI and released on her own recognizance, meaning that she was "technically" free to leave and that she could go home immediately if her doctor approved. The officers resumed questioning defendant, asking her, among other things, what she was wearing at the time of the accident. She responded that she was wearing jeans and a red jacket.

The trial court ruled that defendant was not in custody when she was interviewed in the emergency room. However, with respect to the videotaped statement, the trial court noted that defendant had been moved from the emergency room into another hospital room; that she was interviewed by different officers; that those officers—Burgner and Mall—intended to videotape a statement; that they did not mention that the interview would be videotaped or attempt to secure defendant's consent to videotape the interview; that *Miranda* warnings were "rattled off in a very fast and cursory manner"; that there was "a lot of ancillary noise from the machines in the hospital room beeping and other sounds going off"; that the officers prefaced the *Miranda* warnings by stating that they were going to conduct a "Q&A" session; that defendant did not unambiguously indicate that she understood

her rights; and that, at one point, defendant attempted to stop the interview, but Burgner and Mall "didn't make any effort to leave."

The trial court found it "offensive" that the officers tried to downplay the significance of the interview by calling it a "Q&A" session, by "trying to act as calm and nonchalant and laissez faire as possible," and by trying to "act like [defendant's] pal." The trial court ruled that the "context" of the statement violated *Miranda*.

After the court announced its ruling, the following exchange occurred:

"MR. WEIS [State's Attorney]: *** I think the court must make a finding of certain things, of what the actual violation of *Miranda* that—

THE COURT: There was no waiver.

MR. WEIS: There was no waiver, and that she was in custody?

THE COURT: Clearly she was in custody."

The trial court denied the State's motion to reconsider, and the State filed a timely notice of appeal.

In *Miranda*, the United States Supreme Court held that statements made in response to custodial interrogation by law enforcement officials must be suppressed unless the defendant was advised of, and waived, the right to remain silent and the right to have counsel present during questioning. *Miranda*, 384 U.S. at 478-79, 16 L. Ed. 2d at 726, 86 S. Ct. at 1630. The State contends that the pivotal issue here is whether defendant was in custody at the time of the videotaped interview.

When reviewing a trial court's ruling on a motion to suppress evidence allegedly obtained in violation of *Miranda*, we generally "accord great deference to the trial court's factual findings and will reverse those findings only if they are against the manifest weight of the evidence." *People v. Jeffers*, 365 Ill. App. 3d 422, 427 (2006). Recently, however, a divided panel of this court held that findings of fact based on documentary evidence (including video recordings) available to the reviewing court are subject to *de novo* review, so long as the findings were unaffected by testimony heard by the trial court. *People v. Rubio*, 392 Ill. App. 3d 914, 932-33 (2009), citing *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 453 (2009).[1] Moreover, "the ultimate question posed by the legal challenge to the trial court's rul-

---

[1]Where a videotape leaves no doubt as to a particular factual issue, the distinction between the *de novo* standard and the manifest-weight standard will be academic. Thus, the majority in *Rubio* noted that "[t]he resolution of an issue may hinge on the standard of review *** where the record contains a video recording *but the recording is inconclusive*." (Emphasis added.) *Rubio*, 392 Ill. App. 3d at 931 n.4.

ing" is reviewed *de novo. Jeffers*, 365 Ill. App. 3d at 427. Although we are largely in agreement with the trial court's factual findings, we disagree with the trial court's answer to the ultimate question raised by the State in this appeal—whether defendant was in custody during the videotaped interview.

■ Our supreme court has noted that, "in determining whether a person is 'in custody' for purposes of *Miranda*, a court should first ascertain and examine the circumstances surrounding the interrogation, and then ask if, given those circumstances, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *People v. Braggs*, 209 Ill. 2d 492, 506 (2003). Relevant factors include "(1) the location, time, length, mood, and mode of the questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking or fingerprinting; (5) the manner by which the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the accused." *People v. Slater*, 228 Ill. 2d 137, 150 (2008). It is also proper to consider whether the defendant had reason to believe that he or she was the focus of a criminal investigation. See *Stansbury v. California*, 511 U.S. 318, 325, 128 L. Ed. 2d 293, 300, 114 S. Ct. 1526, 1530 (1994).

■ Upon consideration of all of the relevant factors, we conclude that defendant was not in custody when the videotaped interview was conducted. We acknowledge that two factors support the view that defendant was in custody. One is that defendant was questioned outside the presence of her parents, who were asked to leave her room. "Officers diminish the public character of, and assert their dominion over, an interrogation site by removing a suspect from the presence of third persons who could lend moral support." *United States v. Griffin*, 922 F.2d 1343, 1352 (8th Cir. 1990). Secondly, because defendant had previously been charged with DUI, she was, in all likelihood, aware that she was the focus of Burgner and Mall's investigation of whether criminal wrongdoing contributed to the accident. However, other factors, which we discuss below in some detail, persuade us that a reasonable person in defendant's position would have felt free to terminate the questioning.

First, we consider the location of the questioning—defendant's room in the ICU. Other things being equal, a suspect questioned in familiar (or at least neutral) surroundings does not face the same pressures as one questioned in a police-dominated atmosphere. See 2 W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure §6.6(e), at

738-39 (3d ed. 2007). Therefore, questioning at the police station is more likely to be custodial than questioning at the suspect's home. A hospital is a more neutral setting than either the police station or the defendant's home. On the one hand, a hospital room is not as familiar to the interviewee as his or her home. Significantly, however, a hospital room does not produce the aura of police authority that a police department interview room does. Notably, of seven decisions we have found where Illinois courts have considered whether questioning hospital patients violated *Miranda* (see *People v. Botsis*, 388 Ill. App. 3d 422 (2009); *People v. Ripplinger*, 316 Ill. App. 3d 1261 (2000); *People v. Bates*, 169 Ill. App. 3d 218 (1988); *People v. Romano*, 139 Ill. App. 3d 999 (1985); *People v. Kenning*, 110 Ill. App. 3d 679 (1982); *People v. Clark*, 55 Ill. App. 3d 496 (1977); *People v. Braun*, 98 Ill. App. 2d 5 (1968)), in all but one—*Braun*—the courts concluded that the defendants were *not* in custody.

Not surprisingly, defendant's argument highlights *Braun* as a case involving "facts similar to the case at bar." But however similar the facts might be, the legal landscape relating to custody determinations has changed dramatically since *Braun* was decided. The *Braun* court was evidently of the view that *Miranda* applied because the defendant was the focus of the investigation. See *Braun*, 98 Ill. App. 2d at 7. It has been observed that a footnote in *Miranda* "made it appear that custody and focus were alternative grounds for requiring [*Miranda*] warnings." 2 W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure §6.6(a), at 720 (3d ed. 2007). However, several years after *Braun* was decided, in *Beckwith v. United States*, 425 U.S. 341, 48 L. Ed. 2d 1, 96 S. Ct. 1612 (1976), the United States Supreme Court rejected the notion that *Miranda* warnings are necessary when someone has become the focus of an investigation. See 2 W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure §6.6(a), at 721-22 (3d ed. 2007). Moreover, unlike in this case, in *Braun* the State conceded that the statements that the defendant sought to suppress were "the culmination of custodial interrogation within the meaning of *Miranda.*" *Braun*, 98 Ill. App. 2d at 7. The only question before the court in *Braun* was whether warnings that (in the State's view) substantially complied with *Miranda* were sufficient.

There appears to be no dispute that defendant's injuries prevented her from leaving the hospital room. However, physical incapacity resulting from forces outside the control of law enforcement officials does not, in our view, amount to custody. Rather we follow "the better reasoned approach[,] *** taken by the majority of courts, that the restraint contemplated by *Miranda* is that interference with the defendant's freedom which is imposed by the police." *State v. Tucker,*

131 N.H. 526, 530, 557 A.2d 270, 272 (1989). Illinois cases are consistent with this view. See, *e.g.*, *Botsis*, 388 Ill. App. 3d at 433-34 (defendant who was questioned in emergency room after motor vehicle accident was not in custody, even though he was strapped to a backboard and placed in a cervical collar; defendant was immobilized to facilitate medical treatment, not for purposes of interrogation).

The time of day when the interview took place and the length of the interview also militate against a finding that defendant was in custody. "[Q]uestioning that occurs during the middle of the day, as opposed to late at night, suggest[s] that police have not created a custodial situation." K. Winbush, Annot., *What Constitutes "Custodial Interrogation" at Hospital by Police Officer Within Rule of Miranda v. Arizona Requiring That Suspect Be Informed of His or Her Federal Constitutional Rights Before Custodial Interrogation—Suspect Hospital Patient*, 30 A.L.R.6th 103, 120 (2008). Here, the questioning began early in the afternoon. The interview was longer than in some cases. See, *e.g.*, *Ripplinger*, 316 Ill. App. 3d at 1264 (police officers spoke with the defendant for three to five minutes in room in ICU). However, its length—roughly 35 minutes—is not atypical of noncustodial interviews.

The mood and mode of questioning likewise support the view that defendant was not in custody. The officers did not question defendant aggressively, employ a hostile or accusatory tone, or badger defendant. Defendant was never told that she had to answer the officers' questions, and at the outset she was informed that she could ask the officers questions. About 26 minutes into the interview, defendant expressed concern about what was going to happen to her. One of the officers accurately explained that she had been arrested for DUI but had been released on her own recognizance and was free to go home if her doctor approved. Moreover, only two police officers participated in the interview. See *Riplinger*, 316 Ill. App. 3d at 1271 (noting that there were only two police officers in the room in the ICU where the defendant was questioned).

Indicia of a formal arrest procedure were largely absent. Defendant was not booked, fingerprinted, or handcuffed. No guards were posted outside her hospital room. The only circumstance that might suggest a formal arrest is that Burgner made at least a perfunctory effort to warn defendant in accordance with *Miranda*. Although this might be a factor in determining whether defendant was in custody, "a custodial situation cannot be created by the mere giving of *Miranda* warnings." *People v. McDaniel*, 249 Ill. App. 3d 621, 633 (1993). As one court has stated, "law enforcement officials should be encouraged to provide the *Miranda* warnings to suspects during questioning" and "should not

hesitate to provide suspects with information about their constitutional rights out of concern that doing so will somehow trigger a custody determination." *State v. Grant*, 2008 ME 14, ¶26 n.5, 939 A.2d 93, 101 n.5; see also 2 W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure §6.6(f), at 751-52 (3d ed. 2007) ("The argument that the giving of some of the *Miranda* warnings itself establishes that the situation was custodial has been rightly rejected, for it would be bizarre if such solicitude for a suspect not actually in custody were deemed to make the suspect's statement subject to suppression under *Miranda*").

Finally, defendant's age, intelligence, and mental makeup do not weigh heavily one way or the other in the custody determination. On the one hand, at 23 years of age, defendant was relatively young. However, there is no evidence that she suffered from any intellectual deficit or any mental or emotional problems that would have affected her perception of whether she was free to terminate the questioning. In addition, although defendant had experienced a traumatic event, she appeared lucid throughout the interview and, although visibly distressed at times, she maintained her composure for the most part.

In announcing its decision, the trial court noted that, at one point, defendant attempted to stop the interview and the officers made no attempt to leave when she did so. "[T]he admissibility of statements obtained after the person *in custody* has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " (Emphasis added.) *Michigan v. Mosley*, 423 U.S. 96, 104, 46 L. Ed. 2d 313, 321, 96 S. Ct. 321, 326 (1975). Because the right to cut off questioning is designed to counteract the coercive pressures of the custodial setting, courts have recognized that the right exists only in that setting. See *Slwooko v. State*, 139 P.3d 593, 603 (Alaska App. 2006) (and cases cited therein) ("Courts from around the country agree that, during non-custodial questioning, the police need not immediately stop their efforts when the person being questioned expresses a desire not to speak further"). When the interviewee is *not* in custody, "persistence in questioning [the interviewee] in the face of [his or her] stated desire not to cooperate" is "one factor in determining the voluntariness of [his or her] statements" (*United States v. Serlin*, 707 F.2d 953, 958 (7th Cir. 1983)), but there is no *per se* rule requiring police to cease questioning in such circumstances. In a noncustodial setting, the determination of voluntariness focuses on whether " ' "the behavior of *** law enforcement officials was such as to overbear [a suspect's] will to resist and bring about confessions not freely self-determined." ' " *Serlin*, 707 F.2d at 958, quoting *Beckwith*, 425 U.S. at 348, 48 L. Ed. 2d at 8, 96 S. Ct. at

1617, quoting *Rogers v. Richmond*, 365 U.S. 534, 544, 5 L. Ed. 2d 760, 768, 81 S. Ct. 735, 741 (1961).

Burgner and Mall's reaction to defendant's statement, "I don't want to talk any more," could not have overborne her will. The officers did not indicate that the interview was over, but they also did not immediately resume questioning defendant. Rather, Burgner asked defendant if she wanted to "take a break." However, defendant almost immediately asked what was going to happen to her. Burgner accurately explained that defendant had been arrested and released, that if her doctor said she could go home she was free to do so, and that the State's Attorney would decide if defendant would be charged with any crimes in addition to DUI. Only then did questioning resume, and defendant answered the questions without any apparent hesitance. For similar reasons, we find no merit to defendant's argument that the officers' response to her assertion of the right to remain silent establishes that "[d]efendant had no control over the presence of the officers in her room."

The right to counsel under *Miranda* is an outgrowth of the fifth amendment privilege against self-incrimination. See *People v. Lira*, 318 Ill. App. 3d 118, 123 (2001). Defendant also argues that the interview violated her sixth amendment right to counsel. We disagree. "The sixth amendment right to counsel attaches at or after the initiation of adversarial judicial proceedings—whether by way of a formal charge, preliminary hearing, indictment, information, or arraignment." *People v. Ballard*, 206 Ill. 2d 151, 171 (2002). When Burgner and Mall questioned defendant, she had not yet been indicted or arraigned, no information had been filed, and no preliminary hearing had occurred. Defendant points out, however, that Burgner and Mall had met with an assistant State's Attorney who instructed them to conduct the interview. In defendant's view, this "prosecutorial involvement" triggered her sixth amendment right to counsel. We disagree. It is true that our supreme court has held that "the level of prosecutorial involvement may be considered in determining whether a defendant's sixth amendment right to counsel has attached." *People v. Garrett*, 179 Ill. 2d 239, 248 (1997). However, absent a formal charge, preliminary hearing, indictment, information, or arraignment "[a] defendant has a sixth amendment right to counsel only if there has been *significant* prosecutorial involvement at the time of the questioned action or if the government has committed itself at that time to prosecute defendant." (Emphasis added.) *Garrett*, 179 Ill. 2d at 250. The sixth amendment right to counsel does not attach merely because a prosecutor participates in the investigation of an offense. See *Ballard*, 206 Ill. 2d at 173.

It is true that defendant had already been charged with DUI when Burgner and Mall spoke with her. However, this circumstance does not alter our conclusion that defendant had no sixth amendment right to counsel at that time. The sixth amendment operates differently in misdemeanor cases than it does in felony cases. In misdemeanor cases, an "actual imprisonment" test is used to determine the right to counsel under the sixth amendment. See *People v. Dotson*, 214 Ill. App. 3d 637, 645 (1991). In practice, therefore, the sixth amendment does not serve as a guarantee of counsel at any particular stage of a misdemeanor prosecution; rather, it functions merely as a limitation on the punishment that may be meted out to a defendant who has not been afforded, and who has not waived, the assistance of counsel. See *Scott v. Illinois*, 440 U.S. 367, 59 L. Ed. 2d 383, 99 S. Ct. 1158 (1979) (rejecting the argument that the sixth amendment right to counsel automatically attaches in cases where imprisonment is an authorized penalty). Under certain circumstances, DUI is enhanced to aggravated DUI, a felony. See 625 ILCS 5/11—501(d) (West 2006). However, in its unenhanced form, DUI is a Class A misdemeanor. 625 ILCS 5/11—501(b—2) (West 2006). That is all that defendant had been charged with when Burgner and Mall spoke with her. Indeed, defendant was charged by a complaint, which could not initiate a prosecution for a felony form of DUI. See 725 ILCS 5/111—2(a) (West 2006).

The subsequent issuance of related felony charges did not cause defendant's sixth amendment right to attach retroactively as of the time she was charged with a misdemeanor. *Dotson* illustrates this point. In that case, the defendant was arrested for unlawful use of a weapon. After the defendant was released on bond, the police eavesdropped on one of his telephone conversations. The defendant was later charged with murder, and statements made during the telephone conversation were admitted as evidence against him. On appeal, the defendant argued that the charge of unlawful use of a weapon closely related to the murder and that his sixth amendment rights with respect to the former charge extended to the latter. See *People v. Clankie*, 124 Ill. 2d 456, 463 (1988) ("The United States Supreme Court has *** apparently assumed that sixth amendment rights of one formally charged with an offense extend to offenses closely related to that offense and for which a defendant is subsequently formally accused"). The *Dotson* court rejected the argument, partly because the defendant "ha[d] not established any sixth amendment right to counsel for the misdemeanor weapons charge." *Dotson*, 214 Ill. App. 3d at 646. We likewise conclude that, because defendant had no sixth amendment rights for the misdemeanor DUI charge, there was no sixth amendment right that could extend to subsequent related felony charges.

For the foregoing reasons, we reverse the judgment of the circuit court of Kendall County and remand for further proceedings.

Reversed and remanded.

ZENOFF, P.J., and BURKE, J., concur.