NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 230565-U

NO. 4-23-0565

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 28, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Rock Island County |
| ZACHARY T. WINTERS, | ) | No. 21DT366 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Clayton R. Lee, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Harris and Doherty concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The circuit court properly denied defendant's motion to suppress the statements he gave to police because defendant was not in custody and was not entitled to preinterview admonishments pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶ 2     The State charged defendant, Zachary T. Winters, with two Class A misdemeanors: (1) driving while under the influence (DUI) of alcohol (625 ILCS 5/11-501(a)(1) (West 2020)) and (2) aggravating fleeing or attempting to elude an officer (625 ILCS 5/11-204.1(a) (West 2020)). Defendant filed a motion to suppress statements he gave to police, which the circuit court denied following a contested hearing. The matter then proceeded to a stipulated bench trial, where the court found defendant guilty of the DUI charge, dismissed the

other charge, and sentenced defendant to 12 months of court supervision. Defendant appeals. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                              A. The Crime and Investigation

¶ 5        The crux of this case is what transpired during the interaction between the police and defendant at the outset of their encounter. Because the circuit court reviewed the entire video recorded incident, we will recite our observations in detail. On October 6, 2021, around midnight, Sergeant Derrick Cullison, of the Moline Police Department, attempted to initiate a traffic stop on a gray 2010 Ford Econoline van in Moline, Illinois. The van did not stop and sped away. Cullison issued a dispatch describing the fleeing vehicle. At approximately 12:51 a.m., Officer Ian Newell located a van matching Cullison's description in the parking lot of the QC Stay Inn in Moline, a few miles from where Cullison attempted the traffic stop. Newell's bodycam captured his investigation of the van.

¶ 6        Newell approached the parked van and verified the license plate matched the plate of the vehicle that fled from Cullison, radioing that he found the van. As he looked around the van, Newell noticed someone looking out at him from a second-floor window in the motel, room No. 239. Within a few seconds, at approximately 12:53 a.m., defendant exited room No. 239, quickly followed by another man. Newell recognized defendant, and when the two men exchanged a "What's up?" Newell asked, "Whose van is this?" The other man answered it was his "mom's van." Newell said to the men, "Why don't you stay right there?" and radioed to dispatch, saying he encountered defendant, identifying him by name as Zach Winters, and another man. Newell asked the other man his name, and he answered, "Dylan Rath." Nearly simultaneously, defendant interjected, "We're both drunk, dude." To which Newell responded,

"Alright, stay right there," as he went upstairs to talk with the men on the motel balcony where they stood. Telling them he needed to pat them down for weapons, Newell patted down defendant and Rath. He asked the men if they had weapons, and both answered no. Having determined defendant and Rath were not armed, Newell asked, "Who was driving this van?" Rath quickly answered, pointing to defendant, "He was, I was in here the whole time." Defendant said, "I was driving, he was in the van, too." Rath denied being in the van and implored defendant, "[Y]ou gotta be honest, dude." As defendant and Rath spoke over each other, defendant asked Newell, "Why?"

¶ 7 Newell told the men, "So let's just talk about this, I just want to know what happened." Defendant said, "what happened," and Newell responded, "You tell me." As defendant sighed and turned to the left, Newell said, "Zach, tell me what happened." After a few seconds of silence defendant mumbled, "Can I go in my room real quick?" After clarifying what defendant asked, Newell answered, "Not right this second." Defendant said, "I'm going to jail, I know I am, dude." Newell said, "We haven't even talked about that man. I just want to talk to you about what happened, that's it, okay?" Newell reiterated he had not said anyone was going to jail. When Rath asked if he was free to go, Newell responded, "Not right now."

¶ 8 Defendant, with interjections from Rath, told Newell he drove the van from the QC Stay Inn to Rath's house to get a cigarette machine. Defendant asked several times some iteration of, "Can we not do this tonight?" He also said several times, "I don't want to go to jail" or "I'm going to jail." Newell again told defendant he had not yet said defendant was going to jail. More than six minutes into his encounter with defendant and Rath, Newell was still talking to both men, getting information from both about what they had done that night, where they lived, where they worked, and their phone numbers.

¶ 9        Newell asked defendant if he drank any alcohol since returning to the motel and defendant answered, "No." Newell then asked defendant what happened after the officer tried to pull the van over when he was driving to the motel, and defendant answered, "I got scared, like I know I'm not supposed to be driving." At this point, almost seven minutes into the encounter, a second officer arrived on the motel balcony and began talking with Rath. When Rath began speaking to the officer, defendant turned, looked, and began to engage the second officer, but Newell redirected him by saying, "Zach, they tried to pull you over, you got scared, and then what happened?" Defendant recounted he got scared, called Rath, and tried to get the van to a safe location, which he did. After initially denying it, defendant admitted he fled from police.

¶ 10        Newell next asked defendant again if he drank anything when he returned to the QC Stay Inn. Defendant again said, "No." Newell then asked how much defendant had drunk that night and defendant responded, "Not a whole lot, dude." When Newell said he could smell alcohol on defendant, he said, "I know, but not a whole lot. You know, you know, the thing is, the thing is, dude, I don't eat a lot, and I don't drink enough water." When Newell asked defendant if he felt like he was drunk now, defendant answered, "No." Newell asked defendant if he could do some tests to check if defendant was drunk, and defendant agreed. Newell asked defendant if he would do the tests down in the parking lot, and defendant said, "You're going to take me to jail." Newell again said he had not talked about jail, and he wanted defendant to do the test in an open parking lot rather than a narrow balcony. As the men walked downstairs to the parking lot with the two officers, defendant told Rath, "Take care of my dog, man. *** They're taking me to jail man." Defendant asked if he could remove the New England Patriots sweatshirt he was wearing and give it to Rath because it belonged to him, which Newell allowed. The men then started talking about football with the other officer.

¶ 11        Newell allowed defendant to choose where in the parking lot he would do the field sobriety tests. The testing began at 1:02 a.m., approximately 10 minutes after Newell first saw defendant looking at him from room No. 239. For the next several minutes, defendant tried to complete the field sobriety tests under Newell's supervision, while Rath and other officers stood nearby talking. Newell tried administering four different tests. Defendant attempted the tests, but he could not do them because, he said, his legs were shaking, and he was too nervous. During the testing he said multiple times he was going to jail. After approximately 13 minutes of testing, defendant gave up, turned around, put his arms behind his back, and said, "Come on dude, are you going to take me to jail, let's go to jail, man. Now, I don't want to." Newell handcuffed defendant as Cullison, who had since arrived on the scene, talked with defendant about his attempt to stop the van. Newell transported defendant to the police station. He eventually read defendant his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) at 2:23 a.m.

¶ 12        Later in October 2021, the State charged defendant with multiple counts in two cases, Rock Island County case Nos. 21-DT-366 and 21-TR-10559, including DUI (625 ILCS 5/11-501(a)(1) (West 2020) (case No. 21-DT-366) and aggravated fleeing or attempting to elude a peace officer (625 ILCS 5/11-204(a) (West 2020) (case No. 21-TR-10559). Based on these charges, the State eventually filed a petition to revoke probation in Rock Island County case No. 20-CM-754.

¶ 13                        B. The Motion to Suppress

¶ 14        On January 26, 2023, defendant filed a motion to suppress evidence. Defendant sought to exclude from evidence "the direct and indirect products of his arrest." The motion outlined defendant's encounter with Newell and noted, "Newell did not read *Miranda* warnings

- 5 -

to either [Rath] or [defendant]" before he spoke with them at the QC Stay Inn. Defendant argued Newell subjected him to custodial interrogation without Mirandizing him, so his statements must be suppressed.

¶ 15 The circuit court held a hearing on defendant's motion on April 18, 2023. Defense counsel clarified the motion sought to suppress defendant's confession pursuant to section 114-11 of the Criminal Code of 1963 (725 ILCS 5/114-11 (West 2022)), so the State bore the burden of showing the confession was voluntary. The State called as its lone witness Newell, who was then a detective and school resource officer for the Moline Police Department. He testified he responded to a call about a van fleeing from Sergeant Cullison on October 6, 2021. He recounted finding the van at the QC Stay Inn and encountering defendant and Rath when they exited room No. 239. He testified he recognized defendant "just from previous encounters." Newell recalled asking defendant and Rath who owned the van, and Rath responded his mom owned the van. Newell testified he "could immediately tell that [defendant] had the smell of alcohol on his breath, alcoholic beverage, and his eyes were bloodshot, glassy." Newell opined, "[Defendant] appeared to me to be intoxicated." Newell testified defendant "admitted that he was driving the van, and he eventually admitted that he had fled from the police." Newell stated he conducted field sobriety tests with defendant. He estimated he talked with defendant for "roughly 10 minutes" before beginning the tests. Newell testified he did not arrest defendant until after the field sobriety tests. He believed he had probable cause based on the following:

"So first off, I mean, the van coming back to Dylan Rath—

or Dylan Rath's mom—Dylan saying that it was his. So that tells

me that these two people that exited the room are involved. It's me

approaching Zach, and Zach saying that he was driving. I could

- 6 -

immediately smell alcohol, alcoholic beverage on his breath. He had told me that, or I'd asked him if he had anything to drink since he had gotten back to the hotel. He said no. So that told me that that was the state in which he was driving in. Bloodshot, glassy eyes, speech was a little bit slurred. Yeah."

Newell testified he did not give defendant *Miranda* warnings when they were at the QC Stay Inn, but he eventually Mirandized defendant at the police station, per standard procedure. Through Newell's testimony, the State laid the foundation for introducing the bodycam video showing Newell's interactions with defendant before the field sobriety tests. The State played the video for the court.

¶ 16 On cross-examination, Newell again testified he immediately recognized defendant when he emerged from room No. 239. He recalled he twice told defendant and Rath to "stay right there" on the balcony while he went up to them. He explained he climbed the stairs quickly because the men were out of his sight, he did not know if they were armed, and he did not want them to run away. Newell testified defendant and Rath were not free to leave at that point. He again stated he did not read defendant his *Miranda* rights at that time. Newell confirmed he did not allow defendant to reenter his motel room. He recounted telling defendant to be honest. Newell described his questions to defendant on the motel balcony as a field interview. He testified he eventually arrested defendant and transported him to the police station. Once there, Newell recalled, he read defendant the Warning to Motorist, had defendant wait 20 minutes, oversaw the administration of a Breathalyzer test, and then Mirandized defendant—all pursuant to DUI procedure. He testified that at no time was defendant free to leave. Defense

counsel played the portion of the bodycam video where Newell read defendant his *Miranda* rights, and Newell confirmed the timestamp on the video was 2:23 a.m. on October 6, 2021.

¶ 17 Following arguments from the parties, the circuit court took the matter under advisement and informed the parties it would make its decision by docket entry. Later that same day, April 18, 2023, the court entered the following docket entry:

> "Court after hearing all testimony, arguments, and after reviewing relevant case law and statute, denies the defense council's [*sic*] motion to suppress. The officer was clear on multiple occasions that no determination on arrest had been made, and that he was trying to find out what was going on. The officers [*sic*] questioning was consistant [*sic*] to a normal traffic stop. The officer denying the defendant to move or go into his hotel room was an officer safely [*sic*] issue as the officer was alone, there were two suspects, and they were connected to the fleeing van on the premesis [*sic*]. Based on the totality of the testimony, review of camera footage, review of relevant case law and statutes, as well as arguments made, the Defense Council [*sic*] Motion to Suppress is denied."

¶ 18 On May 23, 2023, defendant filed a motion asking the circuit court to reconsider its previous ruling on the suppression motion.

¶ 19 C. The Stipulated Bench Trial

¶ 20 On June 27, 2023, the parties reconvened before the circuit court, which first took up defendant's motion to reconsider and denied it. Defendant pleaded not guilty and waived a

jury trial. The parties agreed to a stipulated bench trial. The court then questioned defendant and determined he knowingly and voluntarily waived his right to a jury trial.

¶ 21    The State then read the stipulations to the circuit court. Sergeant Cullison would testify about his "attempted *** traffic stop" "on a gray Ford 2010 Econoline van bearing Illinois registration DUET286." The van disregarded the stop, and it fled at a high rate of speed. "[H]e later responded to Officer Newell at the QC Stay Inn, located at 2359 69th Avenue, Moline, Rock Island County, where the above-mentioned van was parked." Officer Newell would testify to his experience and training "in DUI and traffic enforcement." He would also testify about finding the "van parked at the QC Stay Inn and defendant and Dylan Rath on the second floor of the inn overlooking the parking lot; he then spoke with defendant, who admitted to driving the van and driving away from the officer." Newell would also testify to smelling alcohol on defendant, administering standard field sobriety tests, and arresting him for DUI. "Officer Andrew Compton would testify that *** he is certified to administer the breath tests for the breath alcohol content by the Illinois State Police." He would testify about the approved equipment he used for the test, that it was tested regularly, and the machine did not break down or give an error message at any time on October 6, 2021. Compton would testify "that the reading for defendant's [blood alcohol content (BAC)] on October 6, 2021, at 2:10 a.m. was at .224 percent BAC." Finally, "Brandon Hudson would testify that he is a breath analysis technician employed by the Illinois State Police." He would testify that the machine used for defendant's Breathalyzer was tested on October 1, 2021, and the test confirmed "the breath analysis instrument was accurate on October 6th, 2021." Without objection from the defense, the State also offered three exhibits.

¶ 22    The circuit court accepted the parties' stipulations and admitted the exhibits. It found, "[b]ased on the evidence and the agreed stipulation, the Court would find the defendant guilty of the driving—the DUI charge." The parties informed the court they agreed on sentencing: 12 months of court supervision, defendant was required to undergo an alcohol and substance abuse evaluation and complete any recommended treatment, and a $750 fine plus court costs would be imposed. If he complied with the sentence, defendant could return in 12 months and have the case dismissed. Defense counsel stated count I in case No. 21-DT-366 would be dismissed, as would case Nos. 21-TR-10559 and 20-CM-754. The parties asked the court "to honor the understanding between the State and the defense." The court accepted the agreement and entered judgment accordingly. Defense counsel then asked the court to have the clerk file a notice of appeal for defendant and for the Office of the State Appellate Defender to be appointed.

¶ 23    This appeal followed.

¶ 24                        II. ANALYSIS

¶ 25    On appeal, defendant challenges the circuit court's decision denying his motion to suppress his confessions, arguing Newell subjected him to a custodial interrogation without reading him his *Miranda* rights. Defendant breaks down his argument into five subparts: (1) defendant "was in custody when he was questioned by Newell since [his] freedom of movement was restricted in a significant way"; (2) "Newell's statements and actions towards [defendant] were reasonably likely to evoke incriminating responses"; (3) the "court's finding that the interrogation was 'consistent with a normal traffic stop' and not a custodial interrogation was against the manifest weight of the evidence"; (4) "[a]dmitting [defendant's] confession taken from a custodial interrogation without *Miranda* warnings was not a harmless error"; and

(5) "[s]ince Newell deliberately employed a 'question first, warn later' interrogation technique, [defendant's] confession after receiving *Miranda* warnings should be suppressed."

¶ 26 The State counters by arguing the circuit court properly denied defendant's suppression motion because Newell's actions and questions towards defendant did not amount to custodial interrogation and, therefore, did not implicate *Miranda*. The State likens the encounter between Newell and defendant to a brief investigative stop governed by *Terry v. Ohio*, 392 U.S. 1 (1968), where *Miranda* warnings were not required. We agree and affirm.

¶ 27 A. Standard of Review

¶ 28 Motions to suppress evidence involve questions of both law and fact, so when presented with an appeal from a circuit court's ruling on a suppression motion, we employ a two-step analysis. *People v. McDonough*, 239 Ill. 2d 260, 265-66, 940 N.E.2d 1100, 1105 (2010). At step one, we review the court's factual findings and will uphold them unless they are against the manifest weight of the evidence. *McDonough*, 239 Ill. 2d at 266. " 'A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented.' " *People v. Jordan*, 2019 IL App (4th) 190223, ¶ 32, 160 N.E.3d 1006 (quoting *People v. Peterson*, 2017 IL 120331, ¶ 39, 106 N.E.3d 944). We defer to the court's factual findings because it "is in a superior position to determine and weigh the credibility of witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony." *McDonough*, 239 Ill. 2d at 266. At step two, we review the court's legal conclusion—whether the facts warrant suppression under the law— *de novo*, giving no deference to the lower court. *Jordan*, 2019 IL App (4th) 190223, ¶ 32 (citing *People v. Manzo*, 2018 IL 122761, ¶ 25, 129 N.E.3d 1141).

¶ 29 B. The *Terry* Stop

¶ 30       Police officers engage with the public in various ways every day. One common police-citizen encounter is the "brief investigative detention[ ], or '*Terry* stop[ ].' " *People v. Luedemann*, 222 Ill. 2d 530, 544, 857 N.E.2d 187, 196 (2006). "Pursuant to *Terry*, a police officer may conduct a brief, investigatory stop of a person where the officer reasonably believes that the person has committed, or is about to commit, a crime." *People v. Timmsen*, 2016 IL 118181, ¶ 9, 50 N.E.3d 1092 (citing *Terry*, 392 U.S. at 22; *People v. Close*, 238 Ill. 2d 497, 505, 939 N.E.2d 463, 467 (2010)). To briefly detain a person to ask him questions, "[t]he officer must have a 'reasonable, articulable suspicion' that criminal activity is afoot." *Timmsen*, 2016 IL 118181, ¶ 9 (citing *Illinois v. Wardlow*, 528 U.S. 119 (2000)).

¶ 31       *Terry* stops do not necessarily implicate *Miranda*. Courts have long held, "*Miranda* warnings are not required where the police conduct a general on-the-scene investigation as to the facts surrounding a crime or other general questioning." *People v. Havlin*, 409 Ill. App. 3d 427, 435, 947 N.E.2d 893, 899 (2011) (citing *People v. Laspisa*, 243 Ill. App. 3d 777, 783, 612 N.E.2d 994, 998 (1993)); see *People v. Tolefree*, 9 Ill. App. 3d 475, 478, 292 N.E.2d 452, 454 (1972) (citing *People v. Parks*, 48 Ill. 2d 232, 269 N.E.2d 484 (1971)) (stating the same principle); *Berkemer v. McCarty*, 468 U.S. 420, 439-40 (1984) (discussing *Terry* stops and concluding the "nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*"). This means a person can be detained under *Terry* but not be in custody for purposes of *Miranda*.

¶ 32       Considering the evidence before it, namely, Newell's testimony and the bodycam video, the circuit court found Newell's interaction with defendant and his "questioning was consistant [*sic*] to a normal traffic stop," in part, because "[t]he officer was clear on multiple occasions that no determination on arrest had been made, and that he was trying to find out what

- 12 -

was going on." The court further found, "[t]he officer denying the defendant to move or go into his hotel room was an officer safely [*sic*] issue as the officer was alone, there were two suspects, and they were connected to the fleeing van on the premesis [*sic*]." While we would not label Newell's interaction with defendant a "traffic stop," as the circuit court did here, we would call it a *Terry* stop, and we still agree with the court's findings because traffic stops are comparable to *Terry* stops. See *Berkemer*, 468 U.S. at 439 ("[T]he usual traffic stop is more analogous to a so-called '*Terry* stop' [citation] than to a formal arrest."); *Timmsen*, 2016 118181, ¶ 9 ("[A] routine traffic stop is a relatively brief encounter similar to a *Terry* stop rather than to a formal arrest.") (citing *Knowles v. Iowa*, 525 U.S. 113, 117 (1998)). Indeed, because traffic stops and *Terry* stops are so analogous and treated similarly in the case law, we think it extremely likely that the court considered this a *Terry* stop, even though it used the word "traffic stop" in its docket entry order. Nevertheless, we conclude the court's finding does not stand against the manifest weight of the evidence.

¶ 33        Newell's initial encounter with defendant (the approximately 10 minutes from when defendant exited room No. 239 to when field sobriety testing began) amounted to a *Terry* stop. It was a brief, investigative detention. See *Luedemann*, 222 Ill. 2d at 544. Responding to Cullison's dispatch about a fleeing van, Newell located a van in the QC Stay Inn, "a couple miles" from where Cullison attempted the traffic stop, and verified it was the same van that eluded Cullison. As Newell radioed that he found the van, he also observed two people peering out at him from a second-floor window in room No. 239. Defendant emerged from that room, and Newell recognized him immediately from prior interactions. The two exchanged a "What's up," and Newell began investigating the suspected crime of aggravated fleeing a police officer. At this point, finding the same van parked below defendant's hotel room, seeing two people peek

out at him from a window, and having those men then approach him, Newell had specific, articulable facts to reasonably believe criminal activity was afoot. See *Timmsen*, 2016 IL 118181, ¶ 9. He immediately asked who owned the van, and Rath answered his mom owned it. Then, almost simultaneously and unprompted, defendant interjected, "We're both drunk, dude." This admission, coupled with what Newell already knew about the van evading police, provided him reasonable suspicion to investigate another crime that may have been committed, DUI. See *Timmsen*, 2016 IL 118181, ¶ 9.

¶ 34    Once Newell approached defendant on the balcony outside room No. 239, he smelled alcohol on defendant's person and noticed signs of impairment, like glassy, bloodshot eyes and slurred speech. Newell asked defendant and Rath to tell him what happened, and they did. Both defendant and Rath gave Newell information during the interview. Rath told him defendant was driving the van, which defendant confirmed. Both disclosed what they had done that evening, their employment status, where they lived, and their phone numbers—all relevant, routine information gathered during a brief investigatory detention. Whenever defendant digressed off-topic, like talking about his dog, beginning to engage the later arriving officer, or saying he did not want to go to jail, Newell tried redirecting him each time, asking him to tell him about the events of the evening. Defendant admitted to fleeing from police, saying: "I got scared, like I know I'm not supposed to be driving." He said this less than seven minutes into his interaction with Newell.

¶ 35    Newell then pivoted back to the DUI investigation, asking if defendant drank any alcohol since driving the van back to the hotel. Defendant, who had already admitted he was drunk, said, "No." This gave Newell more reason to believe defendant had been impaired when driving the van and fleeing from Cullison. See *Timmsen*, 2016 IL 118181, ¶ 9. When Newell

asked defendant how much he drank that night, defendant responded, "Not a whole lot, dude." Newell told him he could smell the alcohol on him, but defendant still maintained he had not consumed a lot of alcohol. He attributed his appearance to not eating a lot and not drinking enough water. Defendant said he did not feel drunk at that time. This is when Newell asked defendant to perform field sobriety tests.

¶ 36        The discussion between Newell, Rath, and defendant amounted to an on-the-scene investigation wherein Newell asked questions about suspected crimes, so *Miranda* warnings were not required. *Havlin*, 409 Ill. App. 3d at 435 (" 'Absent the interplay of custody and interrogation, an individual's privilege against self-incrimination is not threatened.' ") (quoting *People v. Villalobos*, 193 Ill. 2d 229, 239, 737 N.E.2d 639, 645 (2000)). Based on hearing the dispatch from Cullison, finding the van, seeing Rath and defendant exit the hotel room above the van, and Rath saying the van belonged to his mom, Newell had reason to suspect that either Rath or defendant committed the crime of fleeing from police. Furthermore, once defendant spoke and said, "We're both drunk, dude," Newell had reasonable suspicion to believe a DUI might have occurred, too. Consequently, Newell could briefly detain Rath and defendant to investigate those suspected crimes without reading either Rath or defendant *Miranda* warnings. *Havlin*, 409 Ill. App. 3d at 435. We hold the circuit court's finding that the encounter was a traffic stop was reasonable and did not go against the manifest weight of the evidence, and its legal conclusion that *Miranda* warnings were not required was sound. See *Jordan*, 2019 IL App (4th) 190223, ¶ 32; *McDonough*, 239 Ill. 2d at 266. It properly denied defendant's suppression motion.

¶ 37                    C. No Custodial Interrogation

¶ 38        Although we have found this police-citizen encounter amounted to a *Terry* stop where *Miranda* does not apply, we elect to indulge defendant's argument that he was in custody

- 15 -

and was entitled to *Miranda* warnings. At the suppression hearing in the circuit court, and again here on appeal, defendant focused his custody argument on whether he was free to leave when Newell was asking him questions. We find this argument, although based in case law, to be overly reductive and unhelpful.

¶ 39 "To determine whether a person is in custody, thus requiring *Miranda* warnings prior to questioning, courts engage in a two-part inquiry." *People v. Logan*, 2022 IL App (4th) 210492, ¶ 74, 203 N.E.3d 418. At part one, "courts consider the circumstances surrounding the interrogation." *Logan*, 2022 IL App (4th) 210492, ¶ 74 (citing *People v. Coleman*, 2015 IL App (4th) 140730, ¶ 27, 37 N.E.3d 360). At part two, courts "should determine whether, given those circumstances, a reasonable person, innocent of any crime, would have felt he or she could not terminate the interrogation and leave." *Logan*, 2022 IL App (4th) 210492, ¶ 74 (citing *Coleman*, 2015 IL App (4th) 140730, ¶ 27). Part two is an objective inquiry. *People v. Logan*, 2024 IL 129054, ¶ 59.

¶ 40 For part one, we have identified the following factors as relevant to a determination regarding whether a statement was made in a custodial setting:

"(1) the location, time, length mood, and mode of questioning;

(2) the number of police officers present during the interrogation;

(3) the presence or absence of the individual's family and friends;

(4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking, or fingerprinting;

(5) how the individual arrived at the place of questioning; and

(6) the age, intelligence, and mental makeup of the accused."

*People v. Wright*, 2011 IL App (4th) 100047, ¶ 29, 960 N.E.2d 56

(citing *People v. Slater*, 228 Ill. 2d 137, 150, 886 N.E.2d 986, 995
(2008)).

In light of all these factors, we have explained that "the mere fact that an accused is not free to leave during *** an investigation does not mean that defendant is in custody for *Miranda* purposes." *Havlin*, 409 Ill. App. 3d at 434 (citing *Berkemer*, 468 U.S. at 439-40). We turn now to apply the above six factors.

¶ 41            First, Newell questioned defendant outdoors in a public location, on a hotel balcony. Even though it was after midnight, the bodycam video shows other people coming and going from the QC Stay Inn. Questioning did not occur on the police officer's turf, where there is a higher likelihood for coercion. See *People v. Vasquez*, 393 Ill. App. 3d 185, 190-91, 913 N.E.2d 60, 66 (2009) (discussing various locations where questioning occurs and stating neutral, public settings do not produce the aura of police authority like a police station does). The portion of the interview where defendant gave incriminating statements without having been Mirandized occurred about 10 minutes into a wide-ranging conversation, which weighs against custody. See *Slater*, 228 Ill. 2d at 155 (finding no custody when the evidence "was uncontroverted that [questioning] lasted for the short duration of only between 10 to 15 minutes"). It was immediately apparent from the video that Newell had a rapport with defendant, based on prior interactions. Newell did not raise his voice or affect an aggressive demeanor. He asked defendant to tell him what happened and had to repeat this basic question several times only because defendant would become distracted or change the subject. See *Slater*, 228 Ill. 2d at 156 (noting investigators did not harass or raise their voices when finding defendant was not in custody). Plus, we find it noteworthy that for most of the interview, Newell talked with both defendant and Rath, receiving information from both men. This mode of questioning cautions against custody.

¶ 42       Second, for 6 minutes of the 10-minute interview, Newell was the lone officer on the scene with defendant and Rath. Another officer arrived at 12:59 a.m. and almost exclusively interacted with Rath. Defendant argues the arrival of the second officer intimidated him, but we disagree. From our view of the video, the officer only momentarily distracted defendant and that was because Rath said the officer looked like an actor, which attracted defendant's attention briefly. Once Newell redirected defendant back to his question about the attempted traffic stop, he did not interact with the second police officer, who was engaging exclusively with Rath some distance apart. More officers arrived later during the field sobriety tests, after the interview was over and after defendant had volunteered the incriminating statements. However, Newell was the only officer to ask defendant any questions. All told, we do not infer an overwhelming or coercive police presence from these facts. See *People v. Beltran*, 2011 IL App (2d) 090856, ¶ 42, 956 N.E.2d 1021 (finding no custody when multiple officers were present during questioning, but one officer asked the majority of the questions).

¶ 43       As for the third factor, we note Rath was present for the entire interview. The presence of a friend or family member can "serve[ ] to protect [the defendant] from any potential coercion by the police officer." *In re Tyler G.*, 407 Ill. App. 3d 1089, 1093, 947 N.E.2d 772, 775 (2010). Though not directly stated in the record, we presume Rath and defendant were friends. They appeared that way in the video. They were coworkers hanging out after work. Rath allowed defendant to drive his mom's van to go collect his cigarette machine. They were sharing a hotel room and gave the same address when asked where they lived. Finally, defendant asked Rath to look after his dog when he believed he would be arrested. Rath's presence weighs against defendant being in custody during the interview with Newell. See *Tyler G.*, 407 Ill. App. 3d at 1093.

¶ 44 Fourth, we observed no indicia of a formal arrest during the 10-minute field interview. Defendant was not handcuffed until after he failed the field sobriety testing, well after the interview on the balcony ended. This cautions against custody. See *Slater*, 228 Ill. 2d at 156; *Vasquez*, 393 Ill. App. 3d at 192. Fifth, we note defendant was already at the hotel when Newell arrived. He peeked out the window of room No. 239, revealing his presence to Newell. Further, he exited the room and engaged with Newell voluntarily. See *Slater*, 228 Ill. at 154 (finding no custody when defendant arrived at questioning location and engaged with police voluntarily). Sixth, and finally, defendant was 26 years old on the date of this incident and investigation. There is no evidence in the record indicating defendant suffered from intellectual deficiencies or mental health issues. See *Vasquez*, 393 Ill. App. 3d at 193 (finding no custody when there was no evidence in the record that a defendant in his twenties "suffered from any intellectual deficit or any mental or emotional problems"). In fact, his comments indicate defendant had prior interactions with police and knew what to expect. Aside from being drunk, defendant's mental faculties appeared intact.

¶ 45 Considering these factors, we conclude the circumstances surrounding Newell's questioning of defendant on the balcony at the QC Stay Inn confirm defendant was not in custody. A reasonable person, innocent of a crime, would have felt free to terminate the interview at any time. *Logan*, 2024 IL 129054, ¶ 59. Recall, this is an objective standard. *Logan*, 2024 IL 129054, ¶ 59. Consequently, defendant's claims that he subjectively did not feel free to leave are irrelevant. Defendant's act of trying to bargain with Newell to "work something out" after having already admitted being drunk is not something a reasonable person, innocent of a crime, does. Though he was not free to leave because he was detained, defendant was not in custody and, therefore, he was not entitled to *Miranda* warnings. Since defendant was not in

custody, we need not consider if the questioning amounted to an interrogation. We conclude the circuit court properly denied defendant's suppression motion.

¶ 46                             III. CONCLUSION

¶ 47            For these reasons, we affirm the circuit court's judgment.

¶ 48            Affirmed.